## Wright's Executor v. Simpson.

(Decided December 17, 1929.)

LAWRENCE S. GRAUMAN for appellant.

MATT. J. HOLT for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

The judgment entered by the chancellor was based upon a written contract of date May 27, 1926, signed by W. H. Wright by which he undertook to pay to the appellee, Mamie L. Simpson, the sum of $13,900, which the contract recited he was owing to her on the date of its execution. The suit was instituted by the appellant to foreclose a mortgage to secure a debt of appellee to appellant, and, after upholding the validity of the contract and adjusting the debts between the parties, judgment was entered for $8,808 in favor of appellee. As stated by counsel for appellant, in his brief, the case is an unusual one, and merits most careful and painstaking consideration. W. H. Wright was a colored lawyer and successful business executive. He died on June 29, 1926. Certain litigation concerning his estate has been before this court in two cases. Greene v. Fitzpatrick, 220 Ky. 590, 295 S. W. 896, and again in 228 Ky. 850, 16 S. W. (2d) 477. His executor qualified soon after his death, and, although appellee was in possession of this contract

evidencing a large indebtedness to her, she made no claim against the estate. She was indebted to Wright at the time of his death in the sum of about $7,000 secured by a mortgage on real estate held by appellant. Suit was instituted to enforce the mortgage lien, and then, for the first time, in her answer and counterclaim, she made known the contract evidencing an indebtedness to her by Wright of $13,900.

At the first hearing the chancellor reached the conclusion that the contract would have to be upheld because there was nothing to show that it was not genuine, although he expressed some doubt as to the genuineness of the writing. The submission was set aside, and appellant was allowed to interpose a plea of non est factum, and an issue was joined. Proof was taken showing, or tending to show, that the signature to the contract was not that of Wright, while appellee introduced the three witnesses who signed the contract as witnesses to the writing, and they all testified that they saw him sign it. Other witnesses were introduced by appellee as experts, who testified that, in their opinion, the signature was genuine.

Mr. Albert S. Osborn, a handwriting expert of nationwide reputation, was introduced by appellant, and he testified in a most convincing manner that the signature to the contract was a forgery, and by the enlargement and comparison of signatures he was able to demonstrate that the genuiness of the signature could hardly be believed. Counsel for appellant has dealt extensively with the importance of handwriting experts in cases such as this, and has cited and quoted from many opinions throughout the country pointing out the importance of such testimony. We are not disagreeing with him, or the opinions of the court on which he relies. Undoubtedly a handwriting expert such as Mr. Osborn is shown to be can throw much light on the genuineness of a writing, but we do not believe that counsel for appellant would hardly go far enough to make the contention that the testimony of such an expert should be conclusive. It is entitled to the same weight as other similar evidence, and that means that it must be considered in the light of all facts and circumstances. Assuming that which we believe to be true, that the evidence by other expert witnesses was fairly well offset by those testifying for one party and those

testifying for the other party, we are confronted with the undisputed fact that three eyewitnesses testified that they saw Wright sign the paper. Is the testimony of an expert of the reputation of Mr. Osborn sufficient to overcome the positive testimony of these three eyewitnesses? The chancellor, with some misgivings, reached the conclusion that the evidence of the three eyewitnesses to the signing outweighed the evidence of Mr. Osborn to the contrary. The chancellor did his best to find out the truth, even going to the extent of having the three eyewitnesses called before him for examination. We will let the chancellor speak as to his conclusions:

"On January 19, 1929, I directed judgment to be entered in favor of defendant, Mamie L. Simpson, in accordance with the prayer of her counterclaim and suggested that counsel draw the judgment. At the same time, I filed a memorandum opinion in which I pointed out some of the peculiarities of the transaction upon which the counterclaim was based, peculiarities which aroused the suspicion of the executor as to the genuineness of the instrument upon which Mrs. Simpson relied."

"It was a peculiar thing that Mrs. Simpson should borrow $7,000.00 from Wright, and agree to pay it back in one hundred or more monthly installments, at a time when Wright owed her $13,900. It was a peculiar thing that Mrs. Simpson did not present or even mention her claim of $13,900 against Wright's estate until two years after the qualification of Wright's executor and then only after she had been sued by the executor on her note. It was a peculiar thing that nothing was found among Wright's papers after his death which gave the slightest indication of this large indebtedness to Mrs. Simpson. It was a peculiar thing that Wright, who was not only an educated lawyer, but a successful business man, should have drawn a document so rambling and confused as that upon which Mrs. Simpson relies. It was a peculiar thing that, if Mrs. Simpson and her deceased husband had advanced so large a sum of money to be used, as is recited, in the paper, in the business of the American Mutual Savings Bank and Mammoth Life Insurance Company, the books and records of those companies, of

both of which Wright was president, should have taken the very unusual and wholly unnecessary trouble of having it witnessed by three persons. It was a peculiar thing that the note which had theretofore been given by Wright to Mrs. Simpson and her deceased husband, which were surrendered by her to him when they were merged in this new instrument, and which, as is recited in the latter instruments, had been 'properly witnessed in (Wright's) presence for her protection in case of (his) death,' have never been discovered. It was a peculiar thing that, while the papers found among the effects of Wright after his death disclosed no trace of this indebtedness to Mrs. Simpson, they did include copies of several letters written by Wright to Mrs. Simpson during the year or more prior to his death, in which he demanded payment of monthly installments on the note which she had given to him. Certainly, it is an unusual spectacle to see a debtor thus dunning his creditor. It was a peculiar thing that the stenographer at the American Mutual Savings Bank, who was in the habit of taking all of Wright's dictation, did not write nor have knowledge of this typewritten document and that no copy was found among Wright's papers.

"It was natural that all of these peculiarities should excite suspicion, but upon the first trial of the case the executor did not produce any evidence to overcome the testimony of the subscribing witnesses. Before judgment was entered, the executor tendered an amended reply to Mrs. Simpson's answer and counterclaim in which it denied the execution or delivery of the instrument relied upon by Mrs. Simpson. In support of its motion to file this pleading, there were tendered the affidavits of two or more persons, claiming to be handwriting experts, who stated that they had examined the signature to the instrument in question and believed it to be a forgery. The amended reply was ordered to be filed and time was given for the taking of proof on a question of the genuineness of the signature. A dozen or more depositions were given on this subject by persons who had compared the disputed signature with a number of genuine signatures of Wright. Of this class of evidence, the great preponderance is against

the genuineness of the signature. If I were permitted to decide this case upon this testimony alone, I would not hestiate to adjudge that the disputed signature was a forgery. Upon this subject the testimony of Albert S. Osborn, of New York, a nationally known expert in this field, is particularly persuasive, when taken together with the enlarged photographs which are filed as exhibits with his deposition.

"So powerfully did this testimony operate upon my mind, that, after considering the case for a long time and finding myself in a state of great doubt, I took the unusual course of requiring the depositions of the three subscribing witnesses to be retaken in my presence. At the time when these witnesses had first testified, there had been no plea of non est factum and the examination of these witnesses seemed to me not to have been as searching as this new aspect of the case required.

"These three witnesses have given their testimony in my presence. They are subjected to a vigorous cross-examination. Upon the whole, I do not think it can be said that their former testimony was broken down.

"It is true that there are some contradictions between the earlier and the later testimony of one or more of these witnesses and there are some inconsistencies between the testimony of two witnesses to the same matter. For example, one of the witnesses testified at first that the signing of this paper took place in the evening, whereas he says it took place about noon. Again, the witness, Watson, says that he met the witness, Walker, and talked with him in the lobby of the bank before being called into Wright's private office to witness the paper, whereas Walker says that he was not in the lobby with Watson but saw him for the first time in Wright's private office, when he (Walker) was called in to witness Wright's signature. Perhaps the most striking contradiction found in these depositions is in the testimony of Watson as to the order in which this paper was signed. In his first deposition, given on August 11, 1928, he was asked the question, 'Did you see Wright sign this?' and he answered. 'Wright handed me the paper and said, "I signed it." He claimed

that he had signed it and told me to sign and I saw where the others had signed and I never paid any attention to this further, I just signed it because he told me to sign it.'

"That answer was given upon direct examination and he was not cross-examined up on that point. Subsequently, on February 13, 1929, Watson gave a second deposition, in which, upon direct examination and in answer to the question, 'You were a witness to this contract of W. H. Wright, marked Exhibit A, Simpson and that is your signature, G. F. Watson?' he answered, 'Yes, sir; and *I saw him write it* (my italics). Upon cross-examination, Mr. Watson reiterated that he had seen Wright sign the paper. It did not escape the attention of counsel for the executor that Watson's answer, 'and I saw him write it' was not responsive to the question, that it was apparently contradictory to the statement, made in his first deposition, that Wright 'claimed he had signed it,' and that it seemed to be a gratuitous offering in support of Mrs. Simpson's claim.

"Consequently, when Watson gave his third deposition, on June 17, 1929, he was cross-examined at length upon the circumstances under which he had signed this paper. His attention was called to the conflicting testimony which he had given on his two previous examinations. He says that Wright was sitting at the table writing when he (Watson) went into his private office. He explains that Wright's statement, 'I signed it,' which he had quoted in his original deposition, was made with a view to overcome some hesitation on the part of the witness about signing the paper. He explains that, in order to overcome his hesitation, Wright said to him, 'I have signed it, you sign it,' and that consequently this testimony is not inconsistent with the idea that Wright signed in his presence.

"In his original deposition Watson had said, 'I saw where the others had signed it and I never paid any attention to this further, I just signed it because he told me to sign it.' His attention was called to the fact that this statement (i. e., that the other witnesses had theretofore signed the paper) was inconsistent with the statement, made upon his

third examination, that he had signed before the other two witnesses had signed. He explained that his original statement (that is to say, that he had seen 'where the others had signed it') was 'a slip of the tongue' that he should not have used the word 'had' but what he meant was that he saw the others sign it but not that they had signed it before he signed it.

"How much weight ought to be given to these discrepancies? So far as they have any weight at all, they tend to discredit these witnesses, but is their effect, added to the effect of the expert testimony and the unusual character of the transaction, sufficient to overcome the testimony of these three witnesses that they actually signed this paper at Wright's request in his presence and in the presence of each other and, in the case of Watson and Stewart, that they actually saw Wright affix his signature?

"I think not. So far as this record shows, these three witnesses are persons of good character and have no personal interest in the outcome of this litigation. If I should hold Wright's signature to this paper to be a forgery, I would necessarily convict these three men not only of perjury but of having entered into a fradulent scheme to rob this estate of something more than $14,000. Such a conclusion would be justified only upon very strong evidence. If the expert testimony had demonstrated that the signature was a forgery, as might conceivably be the case, then, of course, I would be bound to decide against the genuineness of the paper. But, while I think the great preponderance of the expert testimony is against the genuineness of the paper, there is testimony of this kind, by reputable witnesses, having some qualification for judging such a question, to the effect that the signature is genuine. I think I have said enough to indicate that the evidence does not relieve my mind of all doubt on this subject, but I do not think the expert testimony excludes the possibility that this signature is the genuine signature of Wright. The peculiarities of the transaction, enumerated above, while very striking and tending strongly to arouse suspicion, are not wholly inconsistent with Wright's having signed the paper. In these circumstances, the testimony of

three unimpeached witnesses, two of whom say that they saw Wright sign and all of whom say that they signed the paper at Wright's request cannot, I think, be disregarded.

"Accordingly, judgment will be given in favor of defendant, Mrs. Simpson, as prayed in her counterclaim. I will ask counsel for Mrs. Simpson to prepare the judgment and to submit it to counsel for the executor before presenting it to me for my signature."

We share the same doubts as the chancellor about the correctness of his conclusion, but, on the whole case, we share his opinion that he reached the right conclusion under the evidence before him. There are cases where it is impossible to know the truth. Circumstances weigh strongly against the validity of the contract. The case made by the circumstances is an unreasonable one for appellee, but the three eyewitnesses stand unimpeached. The testimony of an expert might overcome the testimony of an eyewitness as the expert might be able to demonstrate to the satisfaction of a court, or jury, that a witness had testified falsely, but there are three witnesses here who say that they were present and saw Wright affix his signature to the contract in question, and we are forced to agree with the chancellor that this is not a case where the evidence of experts should overturn the evidence of eyewitnesses, if it may be done in any case.

Judgment affirmed.