## Roberts et al. v. McCown et al.

Dec. 5, 1941.

544

Burke & Sanders for appellants.

E. J. Picklesimer for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE REES—Reversing.

Sol Roberts died a resident of Pike county May 18, 1939, leaving eight children, the appellants, Charlie Bill Roberts, John Lee Roberts, and Adam Roberts, and the appellees, Nancy Roberts McCown, Sollie Jane Damron, Thomas Roberts, Kate Roberts Newsome, and Pernina Roberts Robinson. On August 14, 1939, a will purportedly executed by Sol Roberts and dated March 23, 1934, was probated in the Pike county court. Mary Brafford and Oscar Brewer were named in the body of the will as witnesses, and their names were signed at the end of the attestation clause. Mary Brafford died in 1937, and the will was proved by the testimony of the other attesting witness, Oscar Brewer. The testator left a small amount of personal property, including $1,000 in life insurance, and about 300 acres of land. In clause 1 of his will he directed that his debts be paid out of his personal estate. In clause 2 he gave to his wife, Mary Roberts, all of his personal property including his life insurance and a life estate in his real estate. In clauses 3, 4, and 5 he gave certain tracts of land to the three appellants. In September, 1935, Sol Roberts conveyed to his son Charlie Bill Roberts part of the land devised to him in clause 3 of the will. In clause 6 he gave to his daughters Sollie Jane Damron and Pernina Roberts Robinson "all of the remainder of my farm lying on Peter's branch." In clauses 7 and 8 he gave to his son Thomas Roberts and his daughter Nancy Roberts McCown the debts they owed him. In clause 9 he gave to his daughter Kate Roberts Newsome certain real estate. In clause 10 he directed that if his wife, Mary Roberts, predeceased him all of his personal property should be equally divided between Charlie Bill Roberts, John Lee Roberts, Adam Roberts, Sollie Jane Damron, Kate Roberts Newsome,

and Pernina Roberts Robinson. Mary Roberts died in 1938, about nine months before the death of her husband.

The proof as to the value of the testator's real estate and the shares given to the respective legatees and devisees is slight, but it is stated in appellees' brief that the three appellants received the bulk of the estate under the will. On December 14, 1939, Nancy Roberts McCown and Sollie Jane Damron appealed to the Pike circuit court from the order of the Pike county court probating the will. In the statement of appeal they alleged that the signatures of the testator, Sol Roberts, and the attesting witness Mary Brafford were forgeries. Before the case was tried, Kate Roberts Newsome, Pernina Roberts Robinson, and Thomas Roberts, who had been named appellees in the statement of appeal, filed an intervening petition asking that they be made appellants instead of appellees, and that the will of Sol Roberts, deceased, be adjudged to be a forgery. On the trial of the case the jury found that the writing in controversy was not the last will of Sol Roberts, and the contestees have appealed.

The appellants offered four eyewitnesses to the execution of the will, the attorney who prepared it, and another attorney who had seen it after it was executed. Oscar Brewer testified that he had known Sol Roberts for fifteen or twenty years and visited in his home three or four times a year. He lived in another section of the county several miles from the Roberts home. On the day the will was executed he met Sol Roberts in Pikeville and Roberts invited him to go to his home about twelve miles away for dinner. He reached the Roberts home about 11 a. m., and about an hour later Sol Roberts sent a member of his family for Mary Brafford who lived in the neighborhood. When she arrived two papers were produced, one being the will of Sol Roberts and one the will of his wife. Sol Roberts signed his will, and Mary Brafford and the witness, Brewer, signed it as attesting witnesses. He saw Sol Roberts and Mrs. Brafford sign it. Charlie Bill Roberts, Adam Roberts, and John Lee Roberts were present. Brewer returned to his home that afternoon.

John Lee Roberts lived on his father's farm and had lived near his father's home since his marriage twelve or thirteen years before his father's death. Adam

Roberts was a school teacher 38 years of age, and had always lived with his father and mother. Charlie Bill Roberts was also a school teacher, was married, and lived just across the creek from his father. Thomas Roberts lived in Michigan, Kate Roberts Newsome in West Virginia, and Sollie Jane Damron, Nancy Roberts McCown, and Pernina Roberts Robinson lived in Pike county near their father's home. Thomas Roberts, Kate Roberts Newsome, and Pernina Roberts Robinson did not appear at the trial.

John Lee Roberts, Adam Roberts, and Charlie Bill Roberts testified that they were present when the will was executed and saw their father and attesting witnesses sign it. Charlie Bill Roberts testified that his father sent him to the home of Mary Brafford to request her to come to the Roberts home. She dined with the Roberts family, and at the conclusion of the dinner the will was signed by Sol Roberts and the two attesting witnesses in the dining room on the dining room table. Willis Staten, an attorney of Pikeville, testified that he prepared the will. His testimony reads in part:

"I dictated this will for uncle Sol Roberts. He came to my office and requested—rather to make it more clear I better make a further explanation. He came to my office and brought as many separate wills as he had members of his family, one for his wife, they were written on small tablet paper in pencil. He had the idea that he could prepare his own will and that it was necessary to make a separate will for each member of his family and he brought it to me to examine and advise him and I examined those and advised him that they would be good but that it was not customary to make but one will and let it include each member of the family, in other words advised him fully as to how the will should be prepared to make it good and in regular form and he got me to take those and prepare his will and also one for his wife who wasn't present however. * * * Now, I never was sufficiently familiar with his own hand write to say it was in his handwriting but he brought it written in pencil and told me he had prepared—said me and Mary has prepared our wills and want you to look over them, and it was—I remember it very vividly because of its unusual manner of preparation. * * * This

is the will I prepared, I have no doubt about it because my personal recollection and the corrections in the face of this will are made as I usually make them in pleadings and papers of that kind and written on the Underwood typewriter and my judgment it was my typewriter.''

Sherman Ray, an acquaintance of Sol Roberts, testified that he met Roberts on the street in Pikeville and went with him to Mr. Staten's office where he heard the discussion concerning the will. Roberts had a lot of papers and wanted more than one will written, but ''Mr. Staten suggested they could just put it all in one and they did so.'' J. A. Runyon, county attorney of Pike county, testified that he prepared a deed for Sol Roberts in September, 1935, in which certain land was conveyed to Charlie Bill Roberts. Sol Roberts had with him a will and he asked Mr. Runyon to read it and determine what effect, if any, the deed would have on it as he was conveying to a son a part of the land which had been devised to him in the will. Mr. Runyon advised him that he could convey a part of the land and the will would take effect as to the remainder of it at his death. He identified the probated will as the same will he had read in his office in September, 1935. On cross-examination he was asked these questions and made these answers:

''Q. Did you ever see it any other time? A. That is the only time I ever saw it was when he brought it in there.

''Q. Did you notice whether the will was signed and attested at that time or not? A. Well I—as I recall, he just said that he and his wife had made their will, separate wills and he wanted to know if a deed would have any effect on the balance that wasn't covered by the deed.

''The Court: He wants to know if the will was already signed and witnessed at that time? A. Yes sir, the one I read and I think that is the will, had been signed and as I recall I told him that he should have signed his will by ink and he made some comment that it was signed by indelible pencil.''

We have the original instrument before us, and it appears to have been signed and attested with an indeli-

ble pencil. When pressed to say whether or not it had been signed by witnesses when he saw it, he said: "I wouldn't want to swear to that now, Mr. Picklesimer, it has been so long."

Opposed to this positive and direct testimony concerning the execution of the will is the testimony of five witnesses who were introduced by the appellees for the purpose of showing that the signatures of the testator and Mary Brafford, one of the attesting witnesses, are not genuine. Sollie Jane Damron, one of the contestants, after examining the testator's signature, said: "If that is my father's signature I never did see him write that way before." According to the witness he usually signed his name "K. S. Roberts," but sometimes signed it "Sol Roberts." She did not point out wherein the signature on the will differed from his customary signature. She had been married twenty-three years, was seldom in her father's home after her marriage, and had not seen him write for several years. Nancy McCown testified that she was acquainted with her father's handwriting, and that the testator's name on the will was not written by him. She failed to state in what respect it differed from his customary signature or that she had ever seen her father write or sign his name. She admitted she had not seen any signature of her father made in 1934 about the time the will was executed and that he was ill at that time. Rush Sword, assistant cashier of the Pikeville National Bank, testified that Sol Roberts was a depositor of the bank sometime prior to his death. He was asked these questions and made these answers:

"Q. I will get you to examine the signature of Sol Roberts here on the purported will and say whether or not in your opinion that is the signature of Sol Roberts? A. Well this signature doesn't hardly compare with the past banking records.

"The Court: That is hardly the question, he wants to know if you have an opinion whether or not that is his signature? A. Well all I could form my opinion on would be his signature at the time of his banking and it isn't.

"The Court: How long ago has that been? A. Well it passed along for a few years we did business with him up until—I don't know just what time his account was closed, four or five years ago I think.

"Q. Did he have an account with the Pikeville National Bank in 1934? A. I think so, yes sir.

"Q. Give the jury your opinion whether or not that is his signature from your acquaintance with his writing? A. No, it is not his signature.

"Q. Would you have paid a check on that signature? A. I hardly think so."

Daisy Damron, daughter of Mary Brafford, testified that her mother prior to her death was postmistress and that she worked in the post office as her mother's assistant and was acquainted with her mother's handwriting. She was asked to examine the name "Mary Brafford" on the purported will and state whether or not it was her mother's signature. She answered, "It don't look like my mother's signature, it certainly don't. It certainly doesn't look like it is all I can say." On cross-examination she testified without objection as follows:

"Q. Did your mother talk to you about going over to Mr. Sol Roberts' home at a time when he had executed a will? A. Yes sir, she come back from over there one time and said Sol fixed a will up and she said he signed it today, she said he is pretty sick.

"Q. Your mother lived just across the creek there, neighbor to Mr. Roberts? A. Yes sir.

"Q. And she had gone to Mr. Roberts' house and come back and she said he had signed it and said she had signed it? A. Yes sir, I am not saying she did, she told me in our talking that she had went over there and fixed the will up and they signed it."

Juanita Brafford, another daughter of Mary Brafford, was fifteen years old when her mother died and twelve years old when the will was executed. She testified that she was acquainted with her mother's handwriting and that the name "Mary Brafford" on the will was not her mother's signature. Neither of these witnesses undertook to show in what respect the handwriting differed from that of their mother, and no admittedly genuine signature of Mary Brafford was introduced.

On one side is the testimony of four witnesses who saw the testator and the attesting witness make their

signatures, and their testimony is corroborated by the testimony of two reputable attorneys, one of whom prepared the will. The other attorney saw and read the will eighteen months after it was executed. On the other side is the testimony of five witnesses amounting, at most, to a feeble effort to cast doubt upon the genuineness of the signatures of the testator and one of the attesting witnesses. None of these witnesses testified as an expert on handwriting, and four of them failed to state facts showing acquaintance with the handwriting or signature of the deceased person. Their testimony is wholly without probative value. The witness Daisy Damron probably stated facts qualifying her to express an opinion as to the genuineness of the signature purporting to be that of her mother, Mary Brafford, but the probative effect, if any, of her statement, "It doesn't look like my mother's writing," was destroyed when she admitted later without objection that her mother said after returning from the Roberts home, "She had gone over there and fixed the will up and they signed it."

The following excerpt from the opinion in Pioneer Coal Company v. Polly, 208 Ky. 548, 271 S. W. 592, 594, concerning the testimony of nonexpert witnesses is peculiarly applicable here:

"They testified, in substance, that the decedent's signature on the register was not written by him, according to their opinion. They referred to no fact nor pointed out any reason for their statements and left their flatly stated opinions unaided by the statement of any fact to enable either the court or the jury to draw a legal conclusion as to the accuracy of their testimony, or its probative effect."

In that case it was held that the testimony of nonexpert witnesses constituted, at most, a mere scintilla in support of plaintiff's contention that the deceased did not subscribe his name to the defendant's register, and the judgment rendered upon a verdict finding the signature of the deceased to be a forgery was reversed on the ground the verdict was flagrantly against the evidence, but a peremptory instruction was not directed. The opinion was rendered prior to the decision in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877, which abolished the scintilla rule. While this court has held that nonexpert witnesses may give their opinion as to the genuineness of a signature called in question if they

show they are familiar with the handwriting of the person whose signature is involved, yet it has recognized the weakness of such evidence. Hartford Fire Insurance Company v. Webb, 281 Ky. 276, 135 S. W. (2d) 883.

In Polley v. Cline's Ex'r, 263 Ky. 659, 93 S. W. (2d) 363, a paper offered as the will of Mrs. Mary Ford Cline was rejected as a forgery, and this court reversed the judgment on the ground that the verdict was flagrantly against the evidence. The signature of A. L. Trimble, one of the attesting witnesses who died prior to the death of the testator, was attacked. In that case one of the witnesses testified that he was present when the will was executed. Five witnesses who qualified as experts on handwriting and one of whom claimed to be acquainted with the signature of A. L. Trimble testified that the signature was a forgery. The evidence of forgery was much stronger in Polley v. Cline's Ex'r than in the case before us.

We conclude that the trial court erred in overruling appellants' motion for a peremptory instruction to find the paper in question to be the last will of Sol Roberts.

Judgment reversed, for proceedings consistent herewith.