## Herd v. Herd et al.

Feb. 12, 1943.

William Lewis & Son for appellant.

Luker & Luker for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

Oscar Herd died in Laurel County on May 7, 1939, survived by his widow, Virginia Herd, and his parents, Harve and Rosa Herd. On January 15, 1940, the parents filed a petition in equity against the widow in which they described the estate of the decedent as consisting of personal property, principally cash, of the net value of $6,593.55, and charged that the widow had written and forged an instrument as decedent's will and had it probated upon false testimony in the Laurel County Court. The plaintiffs prayed that the instrument and all proceedings taken in relation thereto be adjudged void and their inheritable shares distributed. The defendant, who was proceeded against as a nonresident, questioned the jurisdiction of the court. The regular judge being disqualified on account of kinship, a special judge was agreed upon. It is said in appellant's brief that another suit had been previously filed by Herd's parents against his widow alleging the same things except that it did not attack the will as a forgery. There is an order of consolidation, but nothing else in the record concerning it.

Considering the evidence, the court held that the decedent was a legal resident of Laurel County and the al-

leged will had been properly probated there; therefore, that the court had jurisdiction. Saving the point, the defendant joined issue by answer and counterclaim, asserting the validity of the instrument as a holographic will and her rights as sole devisee of the estate.

By agreement the case was submitted as a common law action to be tried by the court without a jury and exclusively upon depositions. The court found the paper not to have been wholly written by the decedent; hence, that it was not a valid will. KRS 394.040. The rights of the parties were accordingly adjudged to be as defined in the statute of descent and distribution. The widow appeals.

We accept the conclusion of the court on the contradictory evidence that the Laurel Circuit Court had jurisdiction and pass by the point without discussion, going straight to the question of the authenticity of the disputed document as a holographic will.

The practice of the case was unusual. The petition is in equity and all the evidence was taken by depositions. Yet in the end the case, by agreement, was submitted as a common law action, to be tried without a jury. Unlike a true contest of a will, which is tried de novo in the circuit court, with the duty resting upon the propounders to prove proper execution (see Ramsey v. Howard, 289 Ky. 389, 158 S. W. (2d) 981), the plaintiffs assumed the entire burden in their pleading and proof of establishing the instrument not to be the decedent's will. The allegation of the petition is that it was written and forged by his wife—not that it was not written wholly by him. Yet nowhere in the record is there even a suggestion that Mrs. Herd herself wrote or signed it. Notwithstanding the specific, limited allegation and the absence of proof to support it, the trial court considered the case as presenting the question of whether or not Oscar Herd wrote the body of the instrument as well as signed it, deeming it unimportant as to who else might have done so. We shall do likewise.

We adopt the trial court's statement of the background, namely:

"The undisputed facts are that Oscar Herd and Virginia Box were married in Laurel County, Kentucky, in the year 1923. Oscar was a native of the adjoin-

ing county of Clay and Virginia was a native of Laurel County. Oscar at that time lived at Hamilton, Ohio, where he held a position with the Hamilton Foundry & Machine Company. He began to work for them in 1917 and rose to the grade of foreman. He was a competent and able man and evidently saved his money. After his marriage he and his wife lived at Hamilton for several years and until he was stricken with tuberculosis. He made a trip West for his health. Having been unable to get any relief, he resigned his position at Hamilton, Ohio, and he and his wife started in their car to Kentucky and perhaps on to Florida for the season. While near Berea, Ky., they had a collision with a truck and Oscar received a severe injury to the lung which in all probability hastened his death, which occurred about nineteen months later. Soon after the accident he and his wife went to the home of Steve Box in Laurel County, about six miles from London, and both remained there until the death of Oscar on May 7th, 1939.''

The next morning Mrs. Herd had the disputed document probated in the Laurel County Court, proving it to be wholly in her husband's handwriting by her father, sister and herself. She qualified as administratrix with will annexed. His money had been deposited in a joint account. She checked it out and late that morning took his body to Hamilton, Ohio, for burial in a lot which she had purchased two months before. This haste and the fact that the widow soon left Hamilton and went to Texas is pointed to with the finger of suspicion. Her explanation is that she understood that an administrator had to be appointed where her husband died, and she expected to be gone for awhile. There is evidence of statements of the decedent that he did not intend to make a will; that two or three weeks before he died he said his wife's folk were trying to get him to make a will but he had not done so; that he had enough money and insurance to care for his wife and his parents; and that the law in Kentucky gave them half of the estate where there were no children. On the other side there is evidenc of statements that he expected to leave and had left his estate to his wife. These declarations were admissible in evidence as tending to prove or to disprove the claims that the act of making the will was in fact done or not done.

Atherton v. Gaslin, 194 Ky. 460, 239 S. W. 771. This equi-balanced evidence is obviously of little assistance in the search for the truth. Likewise, the character of disposition of the estate, for either would be rational and natural. Other evidence of different circumstances casts both light and shadows upon the genuineness of the document. We look first to the evidence as to the execution of the paper other than the identification of the handwriting.

The instrument bears date of February 21, 1939, and the place of writing at Brock, Kentucky, the postoffice of his wife's parents, where Oscar Herd had been staying. Harve Herd, his father, testified that he was there that day from early morning until late at night and that no will was written by his son or the subject mentioned. Dale Turner, of Manchester, gave his deposition on March 4, 1941,—two years later—and testified that he rode on the bus on the morning of February 21, 1939, with Harve Herd and that he got off at a house where he said Steve Box lived, and that "his boy was there bad off." His testimony is not persuasive. Harve Herd further testified that his son was delirious that day and had been most of the time for two months before his death, which, as stated, was May 7, 1939. His mother testified that she was at the Box home on February 27th and her son's wife told her not to talk to him because he was delirious and had been for a few days. Arta Bledsoe, his first cousin, testified that she talked with him at different times during his illness and on one occasion (the time not fixed) when talking about writing a letter to somebody he said in response to her question whether he wrote his own letters: "No, my nerve is gone; I haven't written a word for a long time; she (his wife) does my writing." This witness says that his mind was good at that time, and that he could sit up in a chair the last time she saw him. All of this evidence, being negative in character and general in form, is relatively weak. The circumstances are not such as to establish as a positive or even probable sequence that Herd did not write the will. The evidence is based upon negative knowledge. It does tend to prove he did not do so on the date the will bears. But the date is not of controlling materiality, for the issue is not to be determined by reference to the calendar. The important thing is whether he wrote the instrument at any time.

The positive proof on the other side is quite strong. John M. Fields, not related to any of the parties but a close neighbor of Box and a friend of the deceased, who for awhile alternated with his father in sitting up with him at night, testified that one day in February, 1939, Herd's wife called him into the house, saying her husband wanted to see him. He talked with Herd a long time. He testified:

> "Oscar Herd cried and said 'I'm going to die.' I said 'Maybe not.' I talked on to him for sometime after that, about first one thing and then another, trying to get death off his mind. He said 'I am going to make Virginia a will'; and he said 'I just want to ask you about making a will.' And I [she?] said 'Mr. Herd you make a will, I will be satisfied with any way you make.' He said, 'I am going to make a will and ask you to go to Judge Lewis and ask him to draw it and send me a will to go by, to write it from.' I said, 'Yes.' And I come to town the next day. I didn't tell anybody except Virginia. I asked her if he had made it to her. She said not. I said, 'Let him make a will.' "

Judge Lewis prepared a typed form of will which Fields took back and gave to Oscar Herd or his wife, he did not remember which. The father, Harve Herd, was not there.

Homer Fields, a son of John Fields, testified that he had come home from Hamilton, Ohio, the night of February 20th, and the next afternoon went over to see Oscar. Only his wife, her parents and Arthur and Ethel Gephart were there. The sick man was sitting in a chair in his bedroom by the fire. He said he had made his will, and it was there by his side. The paper was written with ink, but the witness could not say it was the instrument that had been probated, although the record does not show that it was exhibited to him.

The Gepharts were also close neighbors. Mrs. Gephart testified she was busy in the Box kitchen one afternoon and Mrs. Herd came in there and got a tablet of paper. The witness went into Oscar's room later and "he told us he had written his will, and there was a paper folded right there on the bed." It was written with pen and ink, which were there by his side. Her husband had been splitting stovewood and when he came in Oscar said

to him: " 'Gep, I done one good thing today,' " and my husband said 'What?' He said, 'I willed Virgie everything I have today.' He always called her Virgie. My husband said, 'That is good, and you are not going to die, you are getting better.' Kinder of talked to him that way." Arthur Gephart testified that when he went in Oscar said to him: " 'Well I did one good thing today.' That was the remark he made, and I said 'What was that Oscar?' and he said: 'I willed Virgie my belongings.' " Both witnesses say that Harve Herd was not there that day. Homer Fields was there that afternoon.

The widow, Mrs. Virginia Herd, testified that a couple of days before the will was written John Fields told her about her husband's purpose to make the will. Later he gave her a typewritten form which she gave to her husband. He did not think the will was full enough and at his request she went to see Judge Lewis and he prepared another form which she gave her husband. At his request she brought him the tablet and a pencil. He wanted a pen, saying that a will would not be legal written with a pencil and it might be erased. He copied the form of the will she had given him while sitting before the fire with the tablet resting on his knee. When he had completed it he laid it over by his side on the bed. She alone was in the room with him, but the others came in as they described. Mrs. Herd filed as an exhibit the typewritten form she had obtained from Judge Lewis and the paper involved is identical in language.

Steve Box, the widow's father, died before the trial. Mrs. Box testified to having heard John Fields tell her daughter that Oscar wanted to make a will and that she was in his room after it had been written and it was "laying on the bed." He said to her: "I have written a will but I am not dead yet."

Thus, the plaintiff's direct evidence tends only to show that Herd did not write the will on the date it bears, while the defendant's positive evidence that he did write it, and on that very day, is overwhelming.

We now examine the opinion evidence. This was confined to witnesses who claimed to know Herd's handwriting. The decedent's father, mother, brother and sisters, and a few others, testified they were familiar with his handwriting and expressed the opinion that he did not write or sign the instrument. Several witnesses of

the same class testified to the opinion that he did write both the body and the name. Some of them, including officers and employees of the company for which he worked in Hamilton, were familiar only with his signature. As the trial court stated, perhaps R. C. Eversole, cashier in a London bank, who knew Herd well, personally and as a customer, and was familiar with his handwriting, was better qualified than any other witness to express an opinion. He testified that in his opinion Herd had signed his name on the will. He had never seen him write anything but his name. R. M. Yader, assistant cashier of the same bank, testified that Herd had signed the paper, but he was not familiar enough with his other writing to express a positive opinion about the body of it. Neither was asked about the body of the instrument. There was similar testimony of others who were familiar only with Herd's signature. None of these many witnesses gave any reason for their conclusions. The evidence was competent but is of a very low and unsatisfactory type. Pioneer Coal Co. v. Polly, 208 Ky. 548, 271 S. W. 592; Stone v. Stone, 263 Ky. 732, 93 S. W. (2d) 617. Indeed, we have a consistent rule in a matter of evaluating opinions concerning testamentary capacity that such testimony possesses no probative value, not even a scintilla, in the absence of a statement of fact within the witness' personal knowledge upon which his opinion is based, sufficient in some degree to support the expressed opinion. Dossenbach v. Reidhar's Ex'x, 245 Ky. 449, 53 S. W. (2d) 731. We have so regarded testimony of nonexperts who did not state facts showing acquaintance with the handwriting or signature of a deceased person whose will was contested as a forgery. Roberts v. McCown, 288 Ky. 543, 156 S. W. (2d) 840.

There were filed in the record for the purpose of comparison two letters and four postcards written by the decedent. The only specimen of the handwriting of the wife, charged with having personally written and signed the will, is a postcard introduced by the plaintiffs. Neither party introduced a single witness skilled in the art of making comparison of handwriting who might have aided the court. The two bankers were not asked to make such comparison. It is a legitimate function of the court to compare a disputed writing with admittedly genuine writings for its own evaluation and to test the opinion evidence of the witnesses. Sowards v. Sowards,

249 Ky. 742, 61 S. W. (2d) 609. We must depend in an unusual degree upon our own study of the writings, bringing to bear in our analysis the aid of textual authorities on the subject. The filing in the record of specimens of genuine writing for the purpose of comparison without introducing a witness capable of making it must be regarded as an invitation to the court to do so the best it can.

The documents may be first considered in a general way both as to their relative characteristics and as tending to corroborate evidence of the circumstances surrounding the execution of the will.

The sole specimen of the wife's handwriting bears a postmark dated May 5, 1939, more than two months after the date of the will and two days before her husband's death. It is written in a vigorous, smooth hand. Comparing this with the will we discover ten substantial differences. However, little attention need be given this comparison, except to destroy a suspicion, for, as indicated, plaintiffs seem to have abandoned their charge that the wife had personally written the will.

The postcards written with a pencil by the decedent are dated in November and December, 1938. Both of his letters are written in ink on paper identical with that on which the will was written and afford an excellent basis for comparison. The first of these, dated December 27, 1938, is in a relatively firm, smooth hand. That of January 27, 1939, is not so smooth and indicates weakness. He expressed his weakness in the letter and said he was feeling worse all the time. The will, written about a month later, reveals nervousness, hesitancy and instability in following straight lines and directing the form of the letters. It is as follows:

"Brock Ky
"February 21—1939

"I, Oscar Herd, being of sound mind and memory do hereby make and publish ~~this as my~~ this as my last will and testament, hereby revoking all former will s made by me

"First: I give and bequeath unto my ~~with~~ wife, Virginia Herd all my property, of every kind and character, Wheresoever situated, of which I may

die the owner of, to have and to hold the same absolutely as her own

"Oscar Herd"

The printed reproduction does not satisfactorily portray the instrument. We all know the difficulty of copying any writing by hand without making a few mistakes. The conditions of instability and irregularity, coupled with the repetition and striking out of the words, as is endeavored to be shown, and a number of other conditions which limitations of space forbid mentioning, all tend to support the testimony that the man was growing weaker, was copying from a form, and may have been writing with the tablet on his knee. Those conditions are potent evidence that the paper was not written in imitation. One undertaking a forgery would hardly have written so crudely. He would have written in a regular and normal way, like the previous writings of the deceased, and tried to have imitated it exactly. See Osborn, Questioned Documents, page 163, quoted with a comment in Polley v. Cline's Ex'r, 263 Ky. 659, 93 S. W. (2d) 363. As disclosed above the evidence was overwhelming that the signature of the paper was Oscar Herd's. The trial court indicated his opinion that it was genuine but did not say so definitely because he thought the body of the paper was not in his handwriting, which in itself destroyed its validity. It would have been very unusual for the wife to write the body of the will, have him sign it, and then claim that he had written all of it. If there were a purpose to forge his will the widow could more readily and safely accomplish her objective. It would have been much easier to have signed his name to the typewritten form and had her family or friends to sign it as witnesses. If they were willing to swear falsely as to Herd having written it all (as would be the effect of a decision that he did not), they would have been willing, no doubt, to swear to his signature alone and to having seen him sign it.

Making a more specific comparative analysis, it is observed that in both the disputed and the conceded writings of the decedent there appears the habit of frequently making a German script type of "t." In writing the word "to" always the "t" begins far below the regular line of writing and the "o" is completed much above the regular line. Indeed, this tendency to elongate or extend above and below the regular line of writing ex-

ists in a number of other letters; likewise the regular "breaking" or "crippling" of certain pen strokes. These and many other identical characteristics prevail throughout to such an extent that their existence cannot be explained away by the presumption that they are the result of an accident. Nor can they be attributed to the hand of a skillful forger in the light of all the other errors or mistakes mentioned. The angle of the writing, the ink, the pen, and the pressure are without variance in the body of the instrument and the signature, the genuineness of which was so well established. Several identifying characteristics are found in the accepted and disputed signatures and these lead to the conclusion that the same hand wrote all of them. The signatures are not exactly alike and this feature is itself evidence of genuineness, since we all know that a person never signs his name in exactly the same way.

As stated in Page on Wills, Section 754:

"The fact that the signature upon the will varies somewhat from testator's ordinary signature, does not establish the fact that it is a forgery. On the other hand the fact that the signature is a facsimile of a genuine signature is said to be almost conclusive evidence that it is a forgery."

And in respect of the whole matter, as said in Strode v. Strode, 194 Ky. 665, 240 S. W. 368, 371, 27 A. L. R. 313:

"We know from observation and experience that no one can produce an exact facsimile of his writing upon any two different occasions. Many elements enter into the creation of the differences, such as the character of paper; whether written with pen or pencil, and, if the latter, whether it was sharp or dull; the position of the writer and of the paper at the time, as well as the physical condition and mental attitude of the writer toward the thing being written."

We are, therefore, convinced from our study of the writings that the will is wholly in Herd's hand.

We closely summarize the evidence having a tendency to support the charge of non est factum and that in opposition, together with our conclusions:

(1) The will was not executed on the day it is dated

and the alleged testator was too weak and ill to have written it about that time. This is destroyed, however, by direct and positive evidence that he did write all of the paper by copying a form identical in language, prepared by an attorney, which it is not denied was furnished him.

(2) The testimony of interested witnesses merely saying they knew testator's handwriting that it was not written by him. Opposing this is similar evidence that it was in his handwriting. Because of the absence of factual reasons this testimony is regarded as of little or no probative weight.

(3) The evidence which is inherent in the instrument itself, i. e., its general nature and character, fully supports the direct testimony as to how and in what manner it was written by the testator.

(4) Our own conclusion reached by a comparison of the handwriting with admitted genuine specimens that the will was written wholly by the testator.

It is the established rule that the Court of Appeals in an equity case determines matters of fact quite independently of the finding of fact by the chancellor, although his decision is given weight and any doubt is resolved by accepting the trial court's conclusion. It is an equally well established rule that in reviewing the judgment in a common law action tried by the judge without a jury, we accept his finding of fact the same as if it were a verdict of a properly instructed jury; and, if there is substantial evidence to support the finding, we yield our own view. There appears to be no sound reason for making the distinction. It is one of those remnants of ancient procedure often originating in a fiction.

The appellant and the appellees respectively contend for the application of the two rules in our consideration of this appeal. Not only was the case begun and practiced as a suit in equity, as we have outlined, but the judgment is consistent. It does not order the judgment of probate in the county court to be vacated, but merely declares the instrument not to be Herd's will, and orders a settlement of his estate by the master commissioner as one of intestacy. The exclusive mode of reviewing the probate of a will in the county court is by an appeal to the circuit court, and the statute declares

the judge shall try questions both of law and fact unless a jury be required; and, further, that "The same effect shall be given to the verdict of a jury in a will case as is given to the verdict of a jury in other cases." KRS 394.240, 394.260, 394.290; Tackett v. Tackett, 204 Ky. 831, 265 S. W. 336, 337. To give effect to this exclusive method of proceeding, it must be held that by their agreement to submit the case without the intervention of a jury the parties elected to treat the proceeding as a will contest, thereby bringing it within the rule declared by the statute for considering the finding of fact. See Powell v. Powell, 177 Ky. 802, 198 S. W. 220. Even under the more restrictive rule applicable in such cases, we are clear in our own minds that had the case been tried with a jury the evidence would have required a peremptory instruction to find against the plaintiffs, who had the burden of establishing the instrument not to be Herd's will. We think that evidence would not be sufficient to support a verdict for the plaintiffs; hence, that it must be held the judge's finding of fact is flagrantly against the evidence. Strode v. Strode, supra; Wright's Ex'r v. Simpson, 232 Ky. 148, 22 S. W. (2d) 583; McCrocklin's Adm'r, v. Lee, 247 Ky. 31, 56 S. W. (2d) 564; Roberts v. McCown, supra.

Wherefore the judgment is reversed.