## Martin et al. v. Webb et al.

May 15, 1945.

Joe Hobson for appellant.

Combs & Combs and Edward L. Allen for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On September 28, 1942, the following document was probated in the Floyd county court:

"I, Kate Martin, wife of Ballard Martin, being of sound mind and memory, and knowing that life is uncertain, and death sure, hereby make my last will and testament. I hereby bequeath to Ballard Martin my husband, all my money & personal property, & all my real estate at my death. I request of him to pay my debts & funeral expenses & double tomb-stones for him & me, except my pet colt and Jersey heifer. I want Margie to have & to keep & I want Ballard to keep & feed them for her. This 7 day of September 1937.

Kate Martin

Witness: W. L. Stumbo
B. L. Sturgill."

Mrs. Martin left no children. "Margie" is the daughter of Creed Martin, a son of Ballard and a former wife. Ballard and Margie were contestees; contestants were Jack, Lizzie and Jim Webb, brothers and sister of Mrs. Martin. Mrs. Martin at death owned an undivided interest in the "home place," some cash, and interest in gas royalties, the value not being divulged.

The will was written in a hospital; Mrs. Martin died in October 1937. In 1942 appellees, surviving heirs at law, appealed to the circuit court, challenging the will, chiefly on the grounds that it was not signed by Mrs. Martin, or another by her authority; that she was unduly influenced, and lacked mental capacity. There was no proof on the latter grounds, and the court submitted on the question as to whether or not Mrs. Martin signed, and that is the only one presented here. Appellees contend that her name was forged. Upon submission ten members of the jury found it not the will.

It is contended by appellants that since they proved the signature, and no evidence of probative value was

offered in contradiction, they were entitled to a peremptory instruction finding for the will. It is also urged that judgment should be reversed because the court admitted incompetent evidence, and because of misconduct of counsel for appellees.

Martin and Katie Webb married in 1925, at a time when she was about fifty years of age, and living at the "home place," with appellees. While there is some hint of disagreement between the two, it may be fairly gathered that such was not of import. Ballard Martin testified that he found the will long after the death of his wife. The paper was in what seems to be a hat box used when traveling. It was in a plain envelope under a small imitation hat made of pasteboard, tacked at ends to the bottom of the box. The writing was in ink on ordinary tablet paper. Martin testified that shortly after he found the will he showed it to Jack Webb, and not very long after it was found offered it for probate. He said that he had seen his wife write her name "different times," and was acquainted with, and this was, her signature. He had looked into the hat box several times after his wife's death, but had never examined the "little hat," but later he had untacked it and found the paper.

He said that after her death he did not begin to look for the will. "I didn't know what she had done about a will; I found it unexpected." The hat box was under a bed, and had never been moved from its place, until he found the will under the hat. He was then looking for a hat to give to some friend. He admitted that it might have been four or five months after he found the paper before he offered it for probate. He had placed the paper in a billfold, and on "my first trip down here I thought I had it, until I came in here to the sheriff's office and asked Bill Sturgill if he remembered the will." He denied that the reason he did not spend more time looking for the will was that he understood he was to take a life estate under the law. He knew his wife had some money in the bank "on interest," but he had never said anything about it "in particular," nor asserted his rights to it. "If I had been as interested in money as I am charged in this thing, I would have been calling for a settlement." It may be noted that appellees had not pressed for settlement. He admitted having seen Dr. Stumbo and Sturgill a few times between the date of the will and the date he found the paper, and neither had

14

mentioned a will. Dr. Stumbo had died in 1941. Neither had they said anything about his wife's death. Also that his wife sometimes signed her name "Kate" and sometimes "Katie." At this point he introduced a check, deposit slip and photostatic copy of a right of way agreement, bearing signatures of his wife. It was brought out that shortly after the document was found he showed it to Jim Webb, and he was asked if "Jim didn't say that wasn't her signature," and he replied, "No, he didn't; he said she never wrote the will."

Sturgill, a former sheriff and jailer of Floyd County, testified that on September 27, 1937, he and Dr. Stumbo witnessed the paper, signing it at Mrs. Martin's request, in the presence of each other after she had signed. He identified Stumbo's signature. He said he was waiting for some person at the hospital, and Stumbo called him into the room; he was then writing the will. Mrs. Martin signed first, then Stumbo, and then he signed. He did not know Mrs. Martin was at the hospital. He did not recall of having heard of her death. He had seen Ballard occasionally, but had never mentioned the will; had never thought of it until Ballard mentioned it shortly before it was probated. He and Stumbo had never discussed the matter, and he had never heard Stumbo mention it to Ballard. He identified the signatures.

Mrs. Wheeler testified that she had written her will, and it was witnessed by Kate and Ballard Martin. Mrs. Martin told her she was coming down some night and wanted her to write her will; that she was going to give her property to Ballard for life, and then to Creed, the stepson. Mrs. Martin did come down several nights, but "there was always somebody there." W. E. Bingham said that two years prior to her death Mrs. Martin said she "aimed to fix her stuff so there would be no lawing over it," and "I asked her who she was going to leave it to and she said 'Ballard'."

Appellees' contention is that the circumstantial evidence introduced justified the passing of the case to the jury, and upholding the vedict. J. W. Webb testified that all four of the children lived on the home place until Kate and Ballard married, and before then and afterwards they had been on good terms. He was at Ballard's home in 1941, and Ballard said, "Here is a will

Kate made." "I asked him who wrote the will and he said Banner Meade. I said 'humph' and turned off." He said he saw him some time later, and asked: "Ballard who wrote that will?" and he said, "Why Walk Stumbo and Bev Sturgill witnessed it, but don't you say nothing to Bev about it; he is a bad man." He seemed to make it appear there were two wills. Ballard denied these statements in part. Webb said that his sister, Mrs. Martin, had signed gas leases and deeds, and that she always spelled her name "Katie." He was shown the will and said, "That is not her signature," explaining "that K don't show up. The letter is a little too big for her handwriting. It is not spelled the way she spelled it." He said that the form of the letters "are a little too long for her handwriting, and not formed just like she wrote. It don't favor her writing. Its a little too big. Its mingled too much—that 'K'; its wobbly writing." Witness then introduced certain documents dated in 1908, 1910, 1921 and 1928, over the objection of contestees, because written so remotely, particularly the older ones, as to be incompetent. In these documents the name of Mrs. Martin was written "Katie." While this witness said he could write his name, it appears on the deeds or leases by mark. He denied that he had told a witness, Hays, after the probate of the will, "If you will help me get some witnesses for this case you can have the timber, and we can work out something on the timber." The witness says he did make the statement in substance.

Sam Martin testified that a short time before Mrs. Martin's death he met her on the way to the home place. "She was carrying a little budget; I asked her, 'Kate are you leaving your husband?' She said 'I sorter am and I sorter aint; in a way he is good, and in a way he aint.' She said he was bothering her a right smart about her stuff up there. She said she wasn't going to tear her old home up. She was going to Jack's, and said Ballard or nobody else could get her to tear her home up." To another, she had said that Ballard wanted her to make a will, and she said she would go home before she would do that; she wanted to "keep it like her father wanted her to; to hold together."

It may be admitted that there are peculiar circumstances surrounding several features of the case, however, the testimony of Ballard Martin is not impeached,

and whether entirely satisfactory or not, on these points it appears to be reasonable, and the will does not manifest an unreasonable disposition. Here we are asked by appellees to uphold the verdict in the face of unimpeached testimony on that of one nonexpert witness, who says the signature is a forgery, and the circumstances.

In Pioneer Coal Co. v. Polly, 208 Ky. 548, 271 S. W. 592, we had a sharp issue as to the genuineness of a signature; there was testimony of relatives of deceased who were acquainted with the signature of deceased, and who testified that the purported signature on the compensation register was not genuine. Opposed was the testimony of some who saw Polly sign the register. The jury had found for plaintiff. We reversed, holding the evidence of those who testified that it was not the signature of Polly was insufficient to overcome the positive evidence of those who saw the signing. We held the scintilla sufficient to take the case to the jury. This was long prior to the Nugent case (Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. 2d 877) which abolished the scintilla rule. See Polley et al. v. Cline's Ex'r et al., 263 Ky. 659, 93 S. W. 2d 363, a will case, and Hartford Fire Ins. Co. v. Webb, 281 Ky. 276, 135 S. W. 2d 883; Roberts v. McCown, 288 Ky. 543, 156 S. W. 2d 840, in both of which (since the Nugent case) we reversed, and held that the court should have directed verdicts for the defendants.

In Herd v. Herd, et al., 293 Ky. 258, 168 S. W. 2d 762, the charge was that the widow of decedent had forged an instrument and had it probated as her husband's will. The court found against the will. We reversed because we concluded that plaintiffs' direct evidence tended only to show that the will was not written on the date borne on the will, while defendants' evidence that testator did write the will was overwhelming. Several said Mr. Herd did not write it; they were familiar with his handwriting. Others, who were more or less skilled in handwriting and by comparative methods, said likewise. We held the latter class of evidence to be competent, but of low and unsatisfactory type.

Contestees introduced a right of way deed, a check and a deposit slip. The purpose of the latter, not bearing Mrs. Martin's signature, was introduced to show

that she carried her bank account in the name of "Kate Martin." On the other hand there were several deeds and some specimens of writing of ancient vintage, one back as far as 1898, introduced in an effort to show a difference in the handwriting, and to show that she had been accustomed to sign her name "Katie" Webb, or Martin. The check, dated in 1936, bore signature of "Kate Martin," the most recent signature before the date of the will, without proof tending to show that this was not a genuine signature. There can be little doubt by comparison that the signatures to the will and the check are in the same hand, as appears to be true as to the signatures on the right of way deeds. It is not insisted that there is resemblance in the samples of writing made by Ballard Martin and signatures on the will and other more recently signed papers. However, we are not controlled by our ideas gained by comparisons, since it is clear that under the rules mentioned above the contestants failed to establish sufficient proof to justify submission to the jury, since the abolition of the scintilla rule.

As to the admission of incompetent testimony, and the claimed misconduct of counsel for contestant, we need say little. The misconduct consisted in the repeating in the hearing of the jury an avowal by counsel after the court had ruled the question objectionable. This should not have been done, but we could not hold it to have been prejudicial. The admitted evidence complained of consisted of the introduction of the signatures of Katie Martin or Katie Webb at remote dates. These were competent for the purpose of showing that it was her custom to sign her name "Katie."

On the whole case we are of the opinion that under the proof adduced the appellants were entitled to a favorable peremptory instruction. The judgment is reversed with directions to grant a new trial, and if the evidence be the same, the court will direct a verdict holding the paper to be the will of Mrs. Martin.