114 So.2d 197 (1959)
LeRoy CLARK, Appellant,
v.
STATE of Florida, Appellee.
No. A-391.
District Court of Appeal of Florida. First District.
August 6, 1959.
*198 Hal A. Davis, Quincy, for appellant.
Richard W. Ervin, Atty. Gen., and Odis M. Henderson, Asst. Atty. Gen., for appellee.
CARROLL, DONALD K., Judge.
The appellant was convicted in the Circuit Court for Columbia County of the crime of unlawfully uttering a forgery and sentenced to serve five years in the state prison. From the judgment of conviction and sentence he filed this appeal.
The indictment on which the appellant was tried charged that on January 30, 1958, in Columbia County he unlawfully and feloniously uttered and published as true to a named person a false and forged check, payable to the order of the appellant in the amount of thirty-seven dollars drawn on a bank in that county and signed in the name of "Bill McClain" as the maker, the check being endorsed on the back by appellant, with intent to injure and defraud the named person and other persons and that the appellant at the time he so uttered and published the check well knew the same to be false and forged.
At the trial the state proved that on the date charged the appellant entered a drugstore in the city of Lake City, Columbia County, picked up a bottle of baby oil, baby powder, and safety pins, and handed to the person named in the indictment the check referred to in the indictment to pay for these items and to cash the check. This person called the bank on which the check was drawn and was told that there was no *199 such account and so he refused to accept the check. A deputy sheriff testified that the appellant denied that he had forged the check and had stated that the check was given him by Bill McClain, that he had helped McClain load a truckload of fruit, and that McClain told him that he lived at Five Points, north of Lake City. This witness also testified that he had lived in Columbia County all of his life but did not know of a Bill McClain, and that he had unsuccessfully tried to locate a Bill McClain. The check in question was admitted in evidence as state's exhibit No. 1.
The Sheriff of Columbia County also testified that he had resided in Columbia County all of his life and had made an investigation and search to locate Bill McClain but was unsuccessful in his effort. An officer of the bank on which the check was drawn testified that there was no account in that bank in the name of Bill McClain, and that he did not know a Bill McClain.
When the state closed, the appellant moved for a directed verdict, which motion was denied by the court. The grounds for the motion were that the evidence was insufficient to sustain the charge, that the corpus delicti had not been established, and that it had not been shown that the instrument in question was a forgery. In denying the defendant's motion for directed verdict, the trial judge made this statement, among others, in the absence of the jury:
"Being the Jury is out, we will look at this check, it is all in the same handwriting, I'm not an expert, but you can look as the (L's) and they are all made alike, the same characteristics, and that can be a question for the Jury to decide too. I don't think I would be authorized to take the case away from the Jury under these circumstances, let them decide whether or not this Defendant in making a statement how he came by the check and who gave it to him, let them decide, it is a matter of whether or not it is a bona fide written document."
The sole witness for the defense was the appellant himself. He testified that he got the check in question from Bill McClain for whom he had been working as a laborer. He admitted trying to purchase the baby oil and baby powder at the drugstore by using the check, saying that he had four babies, with one more expected to be born soon. He admitted that his signature was endorsed on the back of the check.
Following the testimony by the appellant himself, the defense closed, and the appellant moved the court for a directed verdict on the same grounds as in the prior motion at the end of the state's case, and the court denied the motion.
The above seems to us to be a fair statement of the testimony and evidence at the trial. It will be seen that there is not one word of testimony nor any other direct evidence that the check was forged and none that defendant at the time he attempted to cash it had knowledge that it was forged.
The offense of uttering a forged instrument, for which the appellant was indicted and of which he was convicted, is declared to be a crime in this state by Section 831.02, Florida Statutes, F.S.A., which reads as follows:
"Whoever utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in § 831.01 knowing the same to be false, altered, forged or counterfeited, with intent to injure or defraud any person, shall be punished by imprisonment in the state prison not exceeding ten years, or in the county jail not exceeding one year." (Emphasis supplied.)
Section 831.01, referred to in the quoted section, describes the crime of forgery and mentions such writings as writing obligatory, orders for money, among others, and clearly contemplates the forging of a check. It will be remembered that the indictment charged the appellant with uttering and publishing as true a false and forged written *200 order for the payment of money and that he then and there well knew the same to be false and forged.
It is obvious from a reading of the quoted statute and the indictment that two of the essential elements of the offense for which the appellant was tried are (a) that the check was forged and (b) that he knew the check was forged at the time he uttered and published it. Yet we find in the record an absolute absence of any direct evidence to prove that the check was forged or that the appellant knew the check was a forged instrument.
While it seems hardly necessary to cite court decisions for this proposition, in view of the unequivocal language in the quoted statute defining the crime, the Florida Supreme Court has held that the offense of uttering forged instruments consists of the knowledge on the part of the accused that the instrument is false and the intent to injure or defraud another by asserting that the instrument is true. Harrell v. State, 79 Fla. 220, 83 So. 922.
The state contends, however, that the check itself, which was introduced into evidence, was sufficient to apprise the jury that it was made out, signed, and endorsed by one and the same person, and the appellant admitted endorsing the check. Conceding that the check was properly in evidence and before the jury as the paper which the appellant had attempted to utter, the state's contention raises the evidentiary question whether a jury is competent to compare the handwriting on the front and the admitted endorsement on the back of the check and reach the conclusion that the appellant both made and endorsed the check. Our conclusion is that the jury is not competent to do this in the absence of competent testimony with regard to the handwriting in question.
In support of its contention the state calls this court's attention to the similarity of certain capital L's and lower case s's and r's on the front and back of the check, stating that evidently the handwriting was by the same person. As indicated by the trial judge in the above-quoted statement made when denying the appellant's motion for a directed verdict, he apparently acted upon the same line of reasoning, mentioning that "* * * I'm not an expert, but you can look at the (L's) and they are all made alike, the same characteristics, and that can be a question for the Jury to decide too."
By "comparison of handwriting" is now universally meant the actual juxtaposition in court, either by the jury (or a court in its place), or by witnesses, of a writing whose authorship is unknown, with another writing admitted or proved to have been written by a person alleged and denied to have written the first. Black's Law Dictionary, 4th Ed. (1951).
At common law, the most remote and impalpable knowledge of a handwriting was considered sufficient to allow a witness to express his opinion of the authorship of a disputed writing. 62 L.R.A. 817, 818. A witness, for instance, whose knowledge was derived merely from seeing defendant make a writing once nineteen years before the trial, was declared competent to express his opinion as to the authorship of the disputed instrument. 62 L.R.A. 817, 818, citing Horne Tooke's Case, 25 How.St. Tr. 1 (1794). However, the propriety of a witness expressing an opinion in a criminal case as to the authorship of a disputed writing derived from a physical juxtaposition and comparison in court with approved genuine standards was judicially abolished in a series of somewhat conflicting decisions dating from approximately 1683. See 62 L.R.A. 817, 818. Likewise, during this early period, jury comparison of disputed writings was also rejected even though both the standard and disputed writings were often upon the same slip of paper so that no collateral issue was involved. It was not until the decision rendered in De La Motte's Case (1781), 21 How.St.Tr. 687, that proof of the defendant's handwriting by witnesses acquainted with it, was at last allowed again in a criminal trial.
*201 It was the status of the common law of England on July 4, 1776, prior to the decision in the De La Motte's Case, which has been adopted by statute as the law of Florida. Section 2.01, Florida Statutes, F.S.A. As stated by our Supreme Court in Thompson v. Freeman, 111 Fla. 433, 149 So. 740, 743;
"At common law it was not possible to prove the genuineness of a signature or writing by comparison with any other signature or writing. The reasons usually given for the common-law rule were, that the handwriting of a person was constantly changing during his lifetime, and was likely to be affected by his health, mood of mind at the time of writing, his haste or leisure of writing, the character of the pen, ink, or paper, or other fortuitous circumstances. Such factors the common-law judges (perhaps with too high a degree of caution deemed by them to be necessary to guard against the likelihood of perjury or fraud) rendered comparisons of writings, even by admitted experts, too uncertain to be accepted as trustworthy evidence in a matter involving disputed signature or writings."
Thus it is that if any change in the common law rule is to be recognized as the law of Florida, such change must be derived from the statute hereinafter discussed.
The English common law procedure act of 1854 (17 and 18 Vict. Chap. 125) radically changed the law of proof of handwriting. The text of this act, which has been adopted by statute in many states (including Florida), is as follows:
"Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings, and the evidence of witnesses respecting the same, may be submitted to the court and jury as evidence of the genuineness, or otherwise, of the writing in dispute."
Chapter 90.20, Florida Statutes, F.S.A., reads as follows:
"90.20 Comparison of disputed writings.  Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall be permitted to be made by the witnesses; and such writings, and the evidence of witnesses respecting the same, may be submitted to the jury, or to the court in case of a trial by the court, as evidence of the genuineness, or otherwise, of the writing in dispute."
The English Court, in Birch v. Ridgway, 1 Fost. & F. 270 (1858) interpreted the statute of 1854 to mean that any writings, not otherwise relevant, were admissible for the purpose of comparison by the jury when properly proved to be in the defendant's handwriting. However, the English Court in 1863 (Reg. v. Aldridge, 3 Fost. & F. 781) determined that the statute did not apply to criminal cases. This omission was supplied in 1865 by the passage of 28 and 29 Vict. Chap. 18, Para. 8, making the same rule apply in criminal trials.
Although the common law procedure act of 1854 is silent as to the admission of documents for the mere purpose of showing them to the jury for comparison, it was held by the English Court that the admission of the documents for the sole purpose of the jury to compare them was proper. Scard v. Jackson, 24 Week.Rep. 159 (1875). In the Scard case the court was concerned with an action on a bill of exchange. Plaintiff offered no evidence as to the acceptance by the defendant except that the bill and a letter were produced at the trial so that the jury had an opportunity of comparing the handwriting if they had thought it necessary. The Court held that there was some evidence to go to the jury of the defendant's handwriting, and a refusal to nonsuit was proper.
The rule in the American courts as to the admission of proof by comparison is quite varied. The reason for this divergence of views is probably due to the *202 different conceptions, at different periods of the prevailing common law rule in England, then in the process of transformation, when the law of the various states was receiving its first form. 62 L.R.A. 817, 818.
It is noted that some states have followed the modern English rule and take the position that it is proper for the jury or the court, sitting as the trier of facts, without the aid of an expert witness to make a comparison of the disputed writing with a standard produced in court. State ex rel. Winslow v. Fisher, 1941, 109 Ind. App. 644, 37 N.E.2d 280; Brueckner v. City of Pittsburg, 1951, 368 Pa. 554, 84 A.2d 197; Herd v. Herd, 1943, 293 Ky. 258, 168 S.W.2d 762; Mitchell v. Mitchell, 1946, 24 Wash.2d 701, 166 P.2d 938; In re Gatling's Will, Inc., 1951, 234 N.C. 561, 68 S.E.2d 301.
Research reveals two American cases where an appellate court has decided this issue negatively. McIntyre v. Saltysiak, 1954, 205 Md. 415, 109 A.2d 70, 73; Glenn v. Roosevelt, 2 Cir., 1894, 62 F. 550. The Maryland case holds that the statute permitting comparison by witnesses of a genuine writing with a disputed writing and providing for admissibility of such writing and evidence of witnesses respecting the same as evidence of genuineness of disputed writing, contemplated comparison of the writing by witnesses, and did not entitle the jury to make this comparison without some testimony comparing the writings. In the McIntyre case, supra, the appellants introduced in evidence five ground rent deeds executed by the testatrix and also photostat copies of original income tax returns signed by testatrix from 1946 to 1950. The appellants contended that the jury should have been permitted to compare the signatures in reaching a decision whether she signed the will. Quoting first the statute allowing the comparison which is almost identical with Chap. 90.20, Florida Statutes, F.S.A., the Court of Appeals of Maryland reasoned:
"The hereinbefore quoted statute certainly contemplated comparison by witnesses and testimony as to such comparison, and not that the mere offering of other signatures of the testatrix in evidence automatically required the issue to be submitted to the jury as to whether the signature on the will was that of the testatrix. If such were the law, in any case where testatrix' signature was questioned, the caveators could have the issue submitted to the jury merely by offering the testatrix' signature made at a different time. Such was not the intent of the statute. Why the appellants did not produce a bank cashier or a handwriting expert * * * to testify as to any difference in the signatures or why the signature on the will was not genuine, is not explained.
"* * * If there is not sufficient evidence and the jury would only be left to speculation and conjecture on the issues submitted, the court should refuse to submit such issues, should direct a verdict, and withdraw those issues from the jury.
"* * * To have submitted the issues here to the jury would have permitted it to weigh mere speculation and suspicion."
Our own Supreme Court in Boyd v. Gosser, 1919, 78 Fla. 64, 70, 82 So. 758, 760, 6 A.L.R. 500, has alluded to the fact that handwriting is an art concerning which correctness of opinion is susceptible of demonstration. In the Gosser case, the Supreme Court upon the first hearing affirmed the decree of the chancellor by stating that there was much apparently credible positive evidence in the record to the effect that the signatures to the two documents involved were genuine. The Court, upon rehearing the case, reversed themselves conceding that they erred in concluding that testimony of a handwriting expert is merely opinion evidence. The court reasoned that:
"The demonstration, when the signature of a person since deceased is attacked *203 as a forgery, consists, as in this case, of an accumulation of a great mass of facts relating to the formation of letters; the field covered by both the admittedly genuine and questioned signatures; the spacing of the letters, both capitals and small letters; the angles on which they were formed; their relative positions in the signatures; their proportions, slant, alignment, and outline; the surface of the paper which under the microscope shows whether the line upon which the questioned signature rests was drawn before or after the name was written or before or after the paper was folded; the conformity in detail of two signatures, so that when superimposed they show no variation or divergence in a line or direction of a line. All these facts, when established, may confirm the testimony of apparently credible witnesses who testify to the genuineness of the questioned signatures, or establish to the degree of demonstration the falsity of it."
Although our Supreme Court was not concerned with the question of whether or not the jury was qualified to judge for themselves the genuineness of a particular document without the aid of expert testimony, it clearly recognized the comparison of handwritings as an art upon which something more than opinion evidence is needed to determine genuineness.
In Thompson v. Freeman, supra, our court again recognized that in so delicate a matter as the reaching of judicial results by a comparison of writings through the testimony of experts, it ought to be required that the expert witness should exercise his acumen upon the thing itself which is to be the basis of his judgment, and still more, that the thing itself should be at hand to be put under the eye of other witnesses for the trial upon it of their skill.
It would appear that because of the nature of handwriting and the difficulties attendant to comparing documents or writings to determine genuineness, the Florida Supreme Court has consistently recognized that a witness testifying as to his opinion of the genuineness of a writing must either be an expert or sufficiently acquainted with the handwriting of the defendant to testify as a skilled witness. Pittman v. State, 1906, 51 Fla. 94, 41 So. 385, 8 L.R.A.,N.S., 509; Spencer v. State, 1958, 237 Ind. 622, 147 N.E.2d 581. Only recently our Supreme Court reasoned in a forgery prosecution that the admission of alleged forged checks into evidence accompanied by testimony of witnesses pertaining to them was proper for its bearing upon intent. Green v. State, Fla. 1954, 76 So.2d 645, 49 A.L.R.2d 847.
In short, it appears that although the question involved is one of first impression, our Supreme Court has indicated without exception that the comparison of handwritings is an art which can be judicially practiced only by expert or skilled witnesses. To allow a jury to assume the role of expert or skilled practitioners in the field of handwriting with no guide or format from which to base a considered opinion, is placing upon them a responsibility that transcends the average experience and common knowledge of a juryman. Under established rules of law, although a juror may have personally experienced a physical injury he is not competent to determine the extent of disability suffered by a litigant without the aid of expert medical proof. Although most jurors are familiar with firearms, they are not competent to find whether a spent bullet taken from a murder victim was similar to one fired from defendant's pistol without the aid of expert ballistic testimony. By the same token a juror, whose qualifications do not require that he be able to read or write, is not competent to determine whether a disputed signature or writing was made by the same person whose admittedly genuine signature or writing is in evidence, without the aid of skilled or expert testimony.
*204 Since the statute under consideration is in derogation of the common law, it must be strictly construed, under the long-standing rule of statutory construction recognized in this state. Since we believe that the common law rule mentioned above had the effect of forbidding the jury to reach a conclusion regarding the writer of certain disputed handwriting by a comparison with admittedly genuine handwriting, that part of the common law has not been altered by Section 90.20, which specifically provides that the comparison of writing may be made only by witnesses. We do not feel that this statute should or can be given the effect of authorizing the jury to compare handwritings and reach a lawful conclusion as to the identity of the person making a certain writing except upon the testimony of skilled or expert witnesses.
The appellant also assigns as error the trial judge's refusal to give the jury a charge requested by the appellant on the circumstantial evidence rule in criminal cases. If ever there was a case of circumstantial evidence, we think this was it, and a charge on the circumstantial evidence rule should have been given. The other instructions actually given by the judge did not adequately cover this rule, so the judge's refusal to charge on such rule constitutes reversible error.
The judgment of conviction and sentence is reversed for new trial.
WIGGINTON, C.J., concurs.
STURGIS, Judge (dissenting).
As I understand the majority, reversal is based on the premise that conviction of the crime charged rests entirely on circumstantial evidence, thus making it compulsory to charge the jury on the rule of law that governs the jury under such circumstances. It also appears that in reaching that conclusion the majority found it necessary to first determine whether the jury was entitled to examine the check that admittedly bore the endorsement of the accused and without the aid of other evidence form a conclusion as to whether he was the scrivener in whole or in part of the remainder, and resolved that inquiry in the negative. It is obvious that if it had that power, the verdict would be susceptible to the implication that as trier of the facts, it concluded, on the basis of the direct evidence represented by the check, that the accused, notwithstanding his denial, did make out material parts of it and thus had knowledge of its falsity; and in such event the charge in question would have been proper but not mandatory. Conversely, if such power is lacking, as the majority holds, and if the handwriting on the check is the only direct evidence from which such knowledge could be imputed, I would be obliged to concur in the reversal. However, I do not agree that the evidence is so limited, nor am I able to accept the inelastic rule that a jury is incompetent to compare handwritings and reach a lawful conclusion as to the identity of the scrivener except upon the testimony of skilled or expert witnesses. May we not assume that the trial court will not permit a conviction to stand where the evidence fails to establish guilt beyond and to the exclusion of every reasonable doubt?
The check having been properly admitted in evidence, the jury had the right to examine it. While the record is silent as to whether it was so examined, it must be conceded that if an examination was made, it would have necessarily produced upon the minds of an enlightened jury  and by that I mean the average jury of this era rather than of Lord Kenyon's day  some impression as to whether the handwriting found thereon was made by one or more persons; and having the standard of the handwriting of the accused evidenced by his endorsement, I feel that our modern jury is capable and authorized to determine whether the accused was the scrivener of the remainder. Are we to assume that the jury will ignore its sworn obligation to require *205 guilt to be established beyond and to the exclusion of every reasonable doubt, and convict simply because of some similarity in the handwriting, rather than require it to meet that test? I do not think so And if the rule stated by the majority is correct, it would seem that where this type of exhibit is before a jury the accused is entitled to a charge, no less mandatory than that governing circumstantial evidence, forbidding the jury to consider the similarities or variances in handwriting on such exhibits unless aided in their comparisons by expert or skilled testimony.
I do not construe the cited decisions of our Supreme Court of Section 90.20, Florida Statutes, F.S.A., as having the implication stated by the majority. To me they seem to simply make available a type of proof that will better enable the jury to arrive at the truth of authorship where the authenticity of a written instrument is in doubt.
The use of such expert or skilled witnesses as a jury aid should not, however, detract in any degree from the power of the jury to determine the fact of authorship where the visual evidence is capable of interpretation without the use of such witnesses. Indeed, to the practitioner the use of such witnesses is expedient in the exact degree that identity of the handwriting in dispute is calculated to be obvious or obscure. There are fields, such as mentioned in the main opinion, where testimony of expert or skilled witnesses is essential to produce on the minds of the jurors an impression from which to reach an ultimate conclusion. But there are also fields, such as here involved where the use of such witnesses, though permissible, is not necessary to the end in view. For example, the skill of a forger may be such that the fact of forgery can be detected only by one who has become skilled in the art of detecting forgeries. Obviously, the testimony of one so skilled should be admitted to prove the forgery. Conversely, the forgery may be so crude as to be readily recognizable as such by one having a standard for comparison. By the same token, the handwriting contained in the various parts of a single document may be so strikingly uniform in all its characteristics as to permit an unskilled person  even an unlettered juryman  reasonably to conclude that a particular person was the scrivener of particular parts or all of it.
As stated by the majority, the common law of England originally permitted one having the most remote and impalpable knowledge of handwriting to express an opinion of the authorship of a disputed writing. That rule prevailed prior to July 4, 1776, and was in effect in 1794 when the decision was rendered in the cited Horne Tooke's Case, 25 How.St.Tr. 1. Under Section 2.01, Florida Statutes, F.S.A., the common and statute laws of England of a general nature in force on July 4, 1776, were declared to be of force in this state if not inconsistent with the constitution and laws of the United States and the acts of the legislature of this state. A similar provision was in force during the administration of Florida as a territory. Subsequent changes in the English law do not constitute precedent. It will be noted that the cited decision of Lord Kenyon in MacFerson v. Thoytes, Peake N.P.Cas. 20, rejecting the right of the jury to make a comparison of handwriting, was not rendered until 1790. It did not operate, therefore, to modify the English common law with which we are concerned and bound under the statute. Moreover, as the majority indicates, the rule promulgated is the minority rule in the United States, and Lord Kenyon's decision was nullified by the English Common Law Procedure Act of 1854, which is a substantial counterpart of Chapter 90.20, Florida Statutes, F.S.A.
I feel that the majority is unduly concerned with an altogether unrealistic situation: one wherein an etherial individual has given to an unsuspecting and naive laborer a check accepted by the latter in good faith for some type of honest work performed and, as is the wont of apparitions, disappeared from the earth and *206 mortal view. While such a situation could exist, the reasonableness of it is hard to conceive and belongs to that realm of speculation as to which no system of jurisprudence has yet been devised that will protect both the individual and society to the utmost degree.
Aside from what I feel to be the affirmative aspect of what I consider direct evidence to be found in the check itself, there is the negative aspect that the record on appeal does not reflect that the jury was advised that it could make a comparison of the handwriting on the face of the check with the endorsement on the back, or that it did so. The quoted remarks of the trial judge were made in the course of a colloquy concerning defendant's motion for a directed verdict which was denied. The reasonable inference to be drawn from the opinion of the majority is that had the charge on circumstantial evidence been given, the conviction would have been affirmed. Assuming that the quoted remarks  which after all were simply an aside  stated an incorrect principle of law, we are agreed that the ultimate conclusion denying the new trial was correct, and it is elemental that incorrectness of the reasons given is immaterial and does not constitute grounds for reversal if the conclusion is correct.
I also consider the testimony of the witnesses concerning the defendant's statement as to how he came by the check to be direct rather than circumstantial in nature, and if the jury disbelieved it, as the verdict indicates, it was proper for the jury to impute to defendant knowledge of the false nature of the check. The proof presented by the state was unusually strong for such type of case and I do not think the verdict should be disturbed.
Summarizing: 1) It is my opinion that the check was direct evidence, and that the jury was competent, without the aid of expert or skilled witnesses, to make a comparison of the handwriting on its face with the defendant's endorsement on the back and therefrom arrive at a conclusion as to whether a material part of that on the face was placed there by the defendant; 2) that the testimony of expert or skilled witnesses on the subject of handwriting may be produced in any case as an aid to the jury; 3) that there is nothing in the record on appeal to indicate that the jury did in fact examine the subject check to make the comparison; 4) that aside from any inferences that might be drawn from the nature of the handwriting on the check as a predicate for the essential element of knowledge on the part of defendant that the check was false, there is other competent direct evidence from which the jury was entitled to reach that conclusion.
In view of my opinion that the verdict had direct evidence to support it, the trial court was not called on to charge the jury with the rule of law that should govern the jury's deliberations when circumstantial evidence alone is relied on for conviction.
I respectfully dissent.