DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ILLYA LIVINGSTONE TINKER,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-3233

---

**PATRICIA ANNE TINKER,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-3235

[June 8, 2022]

Consolidated appeals from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Barbara Anne McCarthy, Judge; L.T. Case Nos. 180005796CF10A and 18005621CF10A.

Carla P. Lowry of Lowry at Law, P.A., Fort Lauderdale, for appellant Illya Livingstone Tinker.

Carey Haughwout, Public Defender, and Benjamin Eisenberg, Assistant Public Defender, West Palm Beach, for appellant Patricia Anne Tinker.

Ashley Moody, Attorney General, Tallahassee, and Richard Valuntas, Assistant Attorney General, West Palm Beach, for appellee.

CONNER, C.J.

Patricia Anne Tinker ("Defendant Wife") and Illya Tinker ("Defendant Husband") (collectively "Defendants") appeal their judgments and

sentences after a jury found them guilty of over 100 counts related to an alleged scheme involving both Defendants and their son ("the Son")[1]. Although Defendants filed separate appeals, we resolve the appeal with a consolidated opinion. Defendants raise multiple issues on appeal.[2] We agree with Defendants that the trial court erred in: (1) permitting a detective to identify Defendant Wife's and the Son's signatures on documents; and (2) its handling of a document improperly given to the jury during its deliberations. We reverse and remand for a new trial, explaining our reasoning below. We decline to address the remaining issues.[3]

## *Background*

The State's case alleged that Defendants, along with the Son and other co-defendants, effectuated a scheme whereby they obtained properties via fraudulent deeds. Defendants were listed as corporate officers for two companies ("the Companies") Defendant Husband created. The Son was also listed as a corporate officer for one of the Companies for at least some period during the alleged scheme. Defendants and the Son were all tried in front of the same jury, represented by the same counsel. At trial, Defendants faced over 115 counts, including counts of aggravated white-collar crime, grand theft, criminal use of personal identification information, criminal use of a deceased individual's personal identification information, and unlawful filing of false documents or records against property.

At trial, the State did not contest that at least some of the business conducted by the Companies was legitimate. However, the State alleged

---

[1] Defendant's son also appealed his judgments and sentences. Along with this opinion, we also issue an opinion in the son's case, reversing and remanding for entry of a judgment of acquittal. *See Tinker v. State*, 4D19-3232 (Fla. 4th DCA June 8, 2022).

[2] We affirm without discussion an issue raised by Defendant Wife concerning error in permitting a witness to testify as to the disposition of a civil case due to lack of preservation. We also observe that the evidence was not proper unless the defense opened the door.

[3] The remaining issues which both Defendants raise are trial court error in: (1) denying their motions for judgment of acquittal; (2) failing to hold a complete *Richardson* hearing; and (3) denying their motions to preserve the appellate record and improperly reconstructing the record. Defendant Wife also raises the additional issues that: (1) the trial court and State improperly influenced a defense witness not to testify; and (2) the trial court erred in denying her motion under Florida Rule of Criminal Procedure 3.800(b) to correct sentencing error.

2

that the Companies, through Defendants and the Son, also perpetrated fraud. The State entered numerous deeds into evidence, which purportedly transferred ownership interests in over thirty properties to various entities, including the Companies, which the State connected to Defendants. The State also entered numerous other documents into evidence, including powers of attorney, that also connected Defendants to the fraudulently obtained properties. Finally, the State called dozens of witnesses who testified that either their purported signature, or the purported signature of someone with whom they were sufficiently familiar, on the deeds and documents was fraudulent. Witnesses included the purported grantors of properties, family members of deceased individuals who were purported grantors of the properties, and notaries.

Defendants did not contest that the various documents which the State entered into evidence were fraudulent. Instead, Defendants' theory of defense was that they had no knowledge of the fraudulent activity and that the fraud had been perpetrated by a rogue employee of Global Management, along with the help of several other individuals. Background information relevant to each issue on appeal which we address will be provided within the sections addressing each issue.

The jury found Defendants guilty of 101 counts, covering all the different subject matter crimes charged in the information. The trial court granted Defendant Wife's motion for downward departure and sentenced her to thirty-five years in prison, followed by twenty years of probation. The trial court sentenced Defendant Husband to a total of 177 years in prison. Defendants gave notice of appeal.

*Appellate Analysis*

Defendant Wife's and the Son's Signatures

*Additional Background*

At trial, evidence was admitted that Defendant Wife was the only signor on the bank accounts for one of the Companies.

During the lead detective's testimony, the State asked him who notarized a document relating to one of the fraudulently obtained properties. The detective responded that Defendant Wife notarized the document, and Defendants objected. The trial court sustained Defendants' objection based on an improper predicate. The State then asked the detective if he had investigated the appearance of Defendant Wife's signature, and he responded that he had, by looking at "hundreds

3

of checks that [Defendant Wife] has written out of her bank account" and the signature contained in Defendant Wife's driver's license records. Defendants again objected. However, this time, the trial court overruled the objection, explaining, in front of the jury, that the detective was not testifying as an expert, but based on the predicate which he provided and "his training and experience, a lay person with sufficient training and experience can testify." Shortly after, when the State again asked the detective to identify Defendant Wife's signature on the document, Defendants objected. Again, however, the trial court overruled Defendants' objection, and in front of the jury, stated that the detective could identify Defendant Wife's signature "[b]ased on his training and experience and the predicate."

Throughout the remainder of the detective's testimony, he identified multiple signatures on fraudulent documents and told the jury that the signatures belonged to Defendant Wife. Additionally, the detective stated that he had compared the Son's driver's license signature to several signatures on documents connected to the fraudulently obtained properties, and told the jury that the signatures belonged to the Son. The detective's testimony directly refuted Defendants' theory of defense that a rogue employee of one of the Companies had perpetrated the fraud, not Defendants or the Son.

*Analysis*

Defendants argue that the trial court erred in allowing the detective to identify Defendant Wife's and the Son's signatures on documents admitted into evidence over their objection. "The standard of review for the admissibility of evidence is abuse of discretion, limited by the rules of evidence." *Carlisle v. State*, 137 So. 3d 479, 484 (Fla. 4th DCA 2014).

"[A] witness testifying as to his opinion of the genuineness of a writing must either be an expert or sufficiently acquainted with the handwriting of the defendant to testify as a skilled witness." *Clark v. State*, 114 So. 2d 197, 203 (Fla. 1st DCA 1959); *see also Redmond v. State*, 731 So. 2d 77, 78 (Fla. 2d DCA 1999). The detective was not called as an expert witness, and his identification of Defendant Wife's and the Son's signatures was not that of an expert. Thus, the only issue is whether the detective was sufficiently acquainted with Defendant Wife's and the Son's signatures to make the identification. *See Clark*, 114 So. 2d at 203.

To be sufficiently acquainted, a lay witness may identify an individual's signature where the lay witness has seen the individual sign his or her name on different occasions. *See Pittman v. State*, 41 So. 385, 393 (Fla.

4

1906) ("The witness was not testifying as an expert in handwriting, but to the fact that he had seen defendant sign his name on different occasions, and that he thought he was familiar with defendant's signature. This qualified the witness to testify as to the signature of defendant and to give his opinion concerning the same."); *see also Clark v. Grimsley*, 270 So. 2d 53, 57 (Fla. 1st DCA 1972) (finding sufficient lay witness identification of handwriting where "the witness who identified each letter as the handwriting of testatrix testified that for many years prior to testatrix's death she had visited testatrix practically every Thursday, did some shopping for her, and was familiar with her handwriting"). However, a lay witness cannot identify a signature where the familiarity with the handwriting was "acquired for [the] purpose of litigation." *Proctor v. State*, 97 So. 3d 313, 315 (Fla. 5th DCA 2012) (citing *Clark*, 114 So. 2d at 203); Charles W. Ehrhardt, 1 *West's Fla. Practice Series*, section 901.4 (2021 ed.) ("However, a lay witness may not give an opinion as to the handwriting if the familiarity was acquired for the purpose of the litigation.").

Here, in laying a foundation for his testimony that the Defendant Wife's and the Son's signatures were on some of the fraudulent documents in the case, the detective testified that he had viewed the records which he had obtained during his investigation, including "hundreds of checks" written out of the corporate bank account for which Defendant Wife was the sole person authorized to sign checks, as well as Defendant Wife's and the Son's signature on their driver's licenses. In other words, the Detective became "familiar" with Defendant Wife's signature and the Son's signature only during his investigation. We must determine, then, if familiarity acquired for the purposes of a criminal investigation is the same as familiarity acquired for the purposes of litigation.

Defendants argue this case is like *Proctor*. In *Proctor*, two stolen checks were cashed at a bank, and both checks contained an endorsement with the defendant's name. 97 So. 3d at 313. A video of the transaction showed that the man who had presented the stolen checks had provided a Florida driver's license. *Id.* at 313–14. After consulting DAVID,[4] a detective determined that the driver's license number on the checks was "invalid," but found that the defendant's driver's license number was only several digits off from the number endorsed on the stolen checks. *Id.* at 314. After comparing the defendant's photograph in DAVID, watching the video of the transaction, viewing the defendant's signature on file in DAVID, and comparing the signature on the stolen checks, the detective determined the defendant had cashed the stolen checks. *Id.* The defendant was

[4] "DAVID is the acronym for [Florida's] Driver and Vehicle Information Database." *Funderburk v. State*, 264 So. 3d 980, 981 n.1 (Fla. 4th DCA 2019).

charged with two counts of uttering a forged check and two counts of grand theft. *Id.* at 313.

On appeal, the Fifth District found that the trial court erred in denying the defendant's motion in limine and allowing the detective to testify as to both his comparison of the defendant's DAVID photo to the video and his comparison of the defendant's DAVID signature to the signature on the forged checks. *Id.* at 315. Moreover, relevant to the instant case, as to the detective's testimony comparing the defendant's signature on file in DAVID to the signature on the forged checks, the Fifth District found that the trial court erroneously allowed this testimony because the detective "was not sufficiently familiar with [the defendant's] handwriting to form a reliable opinion, and candidly admitted that he was not an expert in handwriting comparison." *Id.* In finding that the detective was not sufficiently familiar with the defendant's handwriting to testify as a lay witness, the Fifth District cited to *Clark* for the proposition that sufficient familiarity with handwriting cannot be "acquired for [the] purpose of litigation." *Id.* (citing *Clark*, 114 So. 2d at 203). In other words, the Fifth District found that the detective in *Proctor*, in gaining familiarity with the defendant's signature during his investigation, gained such familiarity "for [the] purpose of litigation."

We agree with the Fifth District's reasoning and hold that the detective in the instant case acquired familiarity with Defendant Wife's and the Son's handwriting for the purpose of litigation, and thus, the trial court erred in permitting the detective to identify their signatures.

The State argues that any error by the trial court was harmless. We disagree. "The type of error that occurred here is subject to harmless error analysis." *Alvarez v. State*, 147 So. 3d 537, 543 (Fla. 2014). The State seems to argue that the error is harmless because it contends that the evidence against Defendants is strong. However, "the harmless error analysis is not an 'overwhelming-evidence test,'" but instead, "places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *Ventura v. State*, 29 So. 3d 1086, 1089 (Fla. 2010) (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1138–39 (Fla. 1986)).

The State has not met its burden to prove beyond a reasonable doubt that the error did not contribute to the verdict. Defendants' theory of defense at trial was that an employee of one of the Companies had perpetrated the fraud, not Defendants or the Son. However, the detective's

testimony directly connected Defendant Wife to the fraud, identifying that she had notarized some of the fraudulent documents. The detective's testimony established a direct connection to Defendant Wife because "[a] notary public may not notarize a signature on a document unless he or she personally knows, or has satisfactory evidence, that the person whose signature is to be notarized is the individual who is described in and who is executing the instrument." § 117.05(5), Fla. Stat. (2018). Thus, the detective's testimony that Defendant Wife notarized forged deeds is strong evidence of her knowledge of, and participation in, a fraudulent scheme. Accordingly, the State cannot meet its burden to prove that the trial court's error in admitting the testimony did not contribute to the verdict.

Additionally, as stated in *Proctor*, an "[e]rror in admitting improper testimony may be exacerbated where the testimony comes from a police officer," as there is "danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial." 97 So. 3d at 315 (quoting *Martinez v. State*, 761 So. 2d 1074, 1080 (Fla. 2000)). Here, not only was there the usual danger that the jury would defer to the detective based on perceived special training, but the trial court's explanations in front of the jury when ruling on Defendants' objections affirmatively indicated that the detective had some relevant training and experience. Twice when Defendants objected to the detective's testimony, the trial court overruled the objections and added that the detective could identify Defendant Wife's signature because of his "training and experience." By stating this in front of the jury, the trial court exacerbated its error in admitting the detective's testimony by indicating to the jury that the detective had some special training or experience that allowed him to identify Defendant Wife's signature.

Column H

Although Defendants raise three issues regarding the way in which the trial court addressed an unauthorized document going into the jury room during deliberations, we address only two of the issues, making the third issue moot.[5] Additional background is needed for our analysis of the issues.

---

[5] Part of Defendants' argument regarding Column H relates to the trial court's reconstruction of Column H while this appeal was pending. During this appeal, it was discovered that the Chart containing Column H was apparently lost or not properly saved in the circuit court record. However, because we agree that Defendants' other arguments regarding the Chart containing Column H are dispositive, we find the reconstruction of Column H issue to be moot.

*Additional Background*

At the beginning of trial, apparently to assist the jurors in taking notes, the parties agreed to provide the jury with a chart ("the Chart"), which listed the counts against Defendants, the corresponding property address, the corresponding victims, and other information related to each count. At the beginning of its deliberations, the jury sent a question requesting a blank copy of the Chart. A six-page copy of the Chart was then provided to the jury.

Further into the jury's deliberations, the jury sent a note to the trial court stating: "We just noticed that we have two spreadsheet demonstrative aids. One version contains column H with notes. Can you confirm we should have this?" The parties agreed to allow the bailiff to retrieve the document in question and discovered that while the version of the Chart which was given to the jurors before trial contained columns A–G, the version given to the jurors at the beginning of its deliberations contained an additional column, Column H. The State admitted that Column H contained one of the prosecutor's notes on the case, and that Column "H should not have gone back" with the jury. Defendants' counsel pointed to several statements in Column H that he asserted were prejudicial. The State contended in response that "most everything" in Column H was evidence submitted during trial.

The trial court called the members of the jury into the courtroom and placed them under oath. The trial court first questioned the foreperson, who stated that he looked at Column H, considered Column H, and the jury discussed Column H. The trial court then asked each individual juror if he or she looked at Column H, and each responded in the affirmative. The trial court then asked the foreperson if the jury considered Column H "in terms of a verdict" or just looked at it. The foreperson responded that the jurors were discussing the evidence, "[a]nd we saw something that … [m]e, personally, just threw me off completely."

Outside the jury's presence, the trial court suggested that it dismiss the jury for the day, partially, to allow Defendants time to file any appropriate motions. After further discussions regarding how to handle the situation, the trial court brought the jurors back into the courtroom and informed them that they were going to return to the jury room so the attorneys could consider what happened. When the trial court asked the foreperson if he needed to make a phone call to discuss scheduling, the foreperson stated: "I'm still thinking of what we saw. I mean, is that what they are going to discuss?" The jurors went back into the jury room and the trial court announced a ten-minute recess.

After the recess, the trial court immediately announced it had decided that it was going to cut Column H off the Chart and give a curative instruction for the jury to disregard Column H and to keep deliberating. The trial court also stated it was going to give "both [parties] copies of what was sent back." Defendants' counsel moved for a mistrial and said that there was "no curative instruction that you can unring the bell." Further:

> There are codefendants I haven't been allowed to examine. Full six pages [of the Chart]. And the one page I saw my client's names in bold. Everything else isn't. I saw the names of a codefendant whose information we deleted from the charging document.

The trial court denied Defendants' motion for mistrial. The State again said that the information in Column H was elicited at trial, and Defendants responded:

> We've only been allowed to look at one of the pages. Defense counsel has not been allowed to examine all six pages. [The State] has to concede that one of the codefendants who aren't in trial whose information that's been deleted is also in the column. So what about that? There is no way to say that without even looking at the other six pages to see what else is in there that a curative can fix that.
>
> What kind of curative –

The trial court interrupted Defendant's counsel, said it reviewed all pages, and that it made its ruling. The trial court brought the jurors into the courtroom again and instructed the jurors to disregard Column H and to continue deliberating.

*Analysis*

We address two challenges which Defendants raise regarding the trial court's handling of the unauthorized Column H going into the jury room. First, Defendants argue that the trial court erred in denying their motion for mistrial. Second, Defendants argue that the trial court erred in responding to the jury's question without giving them an opportunity to be fully heard. We agree with both challenges and conclude the trial court reversibly erred.

<u>*The Motion for Mistrial*</u>

9

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Salazar v. State*, 991 So. 2d 364, 371 (Fla. 2008). "As a general rule, it is improper to allow materials into the jury's deliberation room that have not been admitted into evidence if the materials are of such character as to influence the jury." *Gonzalez v. State*, 136 So. 3d 1125, 1145 (Fla. 2014). No dispute exists that Column H should not have been given to the jury. However, "jurors' exposure to unauthorized materials is not per se reversible error." *State v. Needelman*, 276 So. 3d 444, 447 (Fla. 5th DCA 2019). Instead, "[o]nce it is determined that extrinsic information was made available to the jury, 'the State has the burden of proving that there is no reasonable possibility of prejudice to the defendant. That is to say, the State must demonstrate that the error was harmless.'" *Id.* (quoting *Williamson v. State*, 894 So. 2d 996, 998 (Fla. 5th DCA 2005)). The harmless error analysis "requires close scrutiny of the type of unauthorized material at issue, its relation to the issues at trial, and the extent to which jurors actually consulted the material." *State v. Hamilton*, 574 So. 2d 124, 127 (Fla. 1991).

In reverse order of the harmless error analysis factors listed in *Hamilton*, the jurors clearly consulted Column H. When the trial court questioned the foreperson, he stated that he looked at Column H, considered Column H, and stated that the jury discussed Column H. The foreperson also described that when he saw Column H, it "personally …. threw [him] off completely," and later stated that he was "still thinking of what we saw." Each individual juror also acknowledged that they looked at Column H. Therefore, the jurors extensively consulted the material.

Undeniably, the material was also related to the case. Column H contains the prosecutor's notes, organized count-by-count, and contains notations on how the State thought it proved the counts.

Finally, for two reasons, the type of material in Column H warrants a mistrial. First, although the State represented that "most" of the information in Column H was elicited at trial, at least one entry contains prejudicial information regarding an employee of one of the Companies witnessing a co-defendant forging a signature. There was testimony at trial that the co-defendant was associated with Defendants, and Defendants' theory of defense was that employee, not Defendants and the Son, perpetrated the crimes. Therefore, the information in Column H provided enhanced evidence of Defendants' guilt *and* undermined their defense.

Second, even if all the information contained in Column H was information elicited at trial, a mistrial was still required. We agree with the Wisconsin Supreme Court analysis discussing a similar circumstance:

> The trial court assumed that there was no prejudice because the prosecutor's notes only recited facts which were stated in the prosecutor's argument to the jury. *However, this would give the state an unfair advantage over the defense because it would refresh the jurors' minds as to facts favorable to the state without the defense having before the jury in written form facts favorable to the defendant which might have explained or rebutted the facts contained in the prosecutor's notes.* The error was prejudicial because it deprived the defendant of a fair trial.

*State v. Sawyer*, 56 N.W.2d 811, 816 (Wis. 1953) (emphasis added). The same is true here – the State was able to metaphorically sit in the jury room with the jurors, and "explain" to them, point-by-point, count-by-count, the evidence which it believed supported Defendants' guilt, without Defendants having an opportunity to respond.

### *The Curative Instruction*

Although the trial court attempted to cure the prejudice of Column H with a curative instruction, we also find two reasons why the curative instruction was insufficient to cure the prejudice to Defendants. *See Smart v. State*, 596 So. 2d 786, 787 (Fla. 3d DCA 1992) ("[W]e find that a curative instruction would not have been sufficient to dissipate the prejudicial effects of this error.").

First, as explained above, and as was the case in *Sawyer*, the main prejudice with Column H is not the extraneous information which the jury could "disregard," but instead, the juror's exposure to "additional" argument from the State. Thus, even disregarding what the jurors *saw* in Column H, the jurors could not truly "disregard" their exposure to further argument.

Second, the trial court gave the curative instruction abruptly after: (1) informing Defendants *and* the jury that a recess would be taken to properly address the matter; and (2) failing to give Defendants full access to inspect the entirety of the Chart containing Column H which the jury was given. This leads to Defendants' second argument regarding the trial court's handling of Column H – the trial court erred in responding to the

11

jury's question without affording Defendants an opportunity to be fully heard.

Florida Rule of Criminal Procedure 3.410(a) states that when jurors request additional instructions after retiring to deliberate, any additional instructions by the trial court "shall be given and the testimony presented only after notice to the prosecuting attorney and to counsel for the defendant." Our supreme court has stated that it is "per se reversible error … where a trial court responds to a jury's question without giving counsel notice and 'the opportunity to participate in the discussion of the action to be taken on the jury's request.'" *Mills v. State*, 620 So. 2d 1006, 1007 (Fla. 1993) (quoting *Ivory v. State*, 351 So. 2d 26, 28 (Fla. 1977)). This is because "communication with the jury is 'so fraught with potential prejudice that it cannot be considered harmless.'" *Id.* (quoting *Ivory*, 351 So. 2d at 28).

When the trial court announced it had decided to give a curative instruction as to Column H, Defendants made it clear that they had not had an opportunity to review the entirety of Column H. Even more, Defendants made it clear to the trial court that they could not *fully* be heard as to a curative instruction without having the opportunity to fully review Column H. After the trial court stated it was going to give a curative instruction, Defendants' counsel began to ask, "What kind of curative –", but the trial court cut off defense counsel and declared that it "made [its] ruling" and was "going to have the deputy bring the jurors in." This was error. *See Thiefault v. State*, 655 So. 2d 1277, 1278 (Fla. 4th DCA 1995) (where unauthorized materials have been presented to the jury during deliberations and the defense does not have the opportunity to address a jury's question, a curative instruction was not sufficient, and a mistrial must be granted).

*Conclusion*

Having determined that the trial court erred in: (1) permitting the detective to identify Defendant Wife's and the Son's signatures on documents; and (2) its handling of the Chart improperly given to the jury during its deliberations, we reverse and remand for a new trial.

*Affirmed in part, reversed in part, and remanded for new trial.*

GROSS and MAY, JJ., concur.

*       *       *

12

*Not final until disposition of timely filed motion for rehearing.*