## Bates, Sr. v. Hogg, et al.

(Decided June 1, 1923.)

### Appeal from Letcher Circuit Court.

1. Bills and Notes—Evidence Held to Sustain Verdict Finding Note was Signed by Co-Maker.—Evidence that the note in suit was given for the purchase price of a business, that it was sent by the purchaser to his father for signature by an agent whose whereabouts were unknown at time of trial, and returned by the agent with a signature thereon which the son and other witnesses, familiar with the father's signature, believed to be the signature of the father, held to sustain a verdict finding that the father signed the note, notwithstanding his denial that he did sign it and the absence of testimony of any witness who saw him sign it.

2. Evidence—Party Familiar with Signature of Documents Treated as Genuine Can Give Opinion.—A person who was familiar with the signature in controversy from seeing it on other papers or documents relied upon by the party whose signature was in controversy and treated by him as genuine can testify as to the handwriting of that party, though he had never seen him write nor seen a signature which he admitted was his.

3. Evidence—Test of Competency of Witness to Handwriting Stated. —A witness introduced to prove the handwriting of a person must have personal knowledge of it either by having seen him write, or by having seen writing admitted by him to be his, or with his knowledge acted upon as his or so adopted into the ordinary business of life as to create a reasonable presumption of its genuineness.

D. D. FIELDS & DAY for appellant.

E. C. O'REAR and R. MONROE FIELDS and F. G. FIELDS for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

In April, 1915, Robert Bates, Jr., bought a mercantile business from Hogg & Son. As a part of the purchase price there was delivered by Robert Bates, Jr., to Hogg & Son a negotiable note for thirteen hundred and thirteen dollars, payable in one year thereafter and purporting to be signed by Robert Bates, Jr., and Robert Bates, Sr.

On the 5th of May thereafter, and before the maturity of the note, Hogg & Son assigned same to Susan Cornett for a valuable consideration. After the maturity of the note, the same remaining unpaid, Susan Cornett brought

her action thereon against both the makers and the endorsers.

Hogg & Son filed an answer admitting the material allegations of the petition, a judgment was entered against them for the amount of the note and it is conceded that they thereafter paid that judgment.

Robert Bates, Sr., filed his separate answer to the Cornett suit wherein he denied that he executed or delivered the same to Hogg & Son, and affirmatively alleges that his name to that note as an obligor is a forgery, and that he did not sign same or authorize anyone to sign the same for him, and his signature appearing thereon is a forgery, false and untrue.

Hogg & Son filed their cross-petition against Robert Bates, Jr., and Robert Bates, Sr., wherein they prayed judgment over against the makers of the note for the amount thereof with the interest.

To this cross-petition Robert Bates, Sr., filed his separate answer again denying execution of the note.

On the issues thus presented in the cross-petition a jury trial was had and a verdict returned for Hogg & Son for the amount of the note, and from a judgment entered on that verdict this appeal is prosecuted.

At the time of the execution of that note Robert Bates, Sr., was ninety years of age, and at the time he thereafter testified in this action he was ninety-four years of age.

Only two grounds are urged for reversal: (a) That the verdict is flagrantly against the evidence; and (b) that incompetent evidence was admitted against appellant over his objection.

No witness states he saw appellant sign the note. Robert Bates, Jr., is a son of appellant, and at the time of the transaction in question lived some eight or ten miles distant from him. Robert Bates, Jr., at that time had an employe named Johnson, and after the note had been prepared and signed by Robert Bates, Jr., the latter sent his employe Johnson with the note to the home of his father to be signed by the latter. Johnson returned the note to him and it purported to bear the signature of Robert Bates, Sr., and Robert Bates, Jr., believing the same to be his father's signature turned the same over to Hogg & Son. The parties were residents of Letcher county, but Johnson, the then employe of Robert Bates, Jr., had come from Floyd county, Kentucky, and before

the question arose as to the genuineness of the signature of Robert Bates, Sr., Johnson had gone into the army, and so far as this record discloses none of the parties to it have since known of or heard from him.

Robert Bates, Sr., testifies positively that he did not sign the note. On the other hand the evidence of appellee George Hogg is that he was acquainted with the signature of Robert Bates, Sr., and that since this suit was brought he had seen him sign his name once and that he believed the signature to be that of Robert Bates, Sr. He stated in addition that he was connected with a bank, either as director or stockholder, at which Robert Bates, Sr., did business, and that he had seen his name and was familiar with his signature.

Jim Day testified that he was assistant cashier of the First National Bank, and had been for five years, and that Robert Bates, Sr., had an account at the bank and he was familiar with his handwriting; that the signature on the note in question looked like his signature about the year 1915, but that it did not look so much like it as it appeared at the time of the trial; that he had been a director in the bank several years before 1915 and was familiar with Bates, Sr.'s signature, but could not say whether he had ever seen him write before the date of the note, and that his signature now is a little more shaky than it formerly was.

J. S. Fairchild stated that he was the cashier of the First National Bank and had been since June, 1914; that R. Bates, Sr., did business with the bank and had a few checks and notes and papers that came through it, and had a checking account there at times; that he was not very familiar with his handwriting, but thought he knew his signature, and that when the note in question was brought to the bank it was compared with one of Bates' signatures they had there at the time, and expressed the opinion that it was the handwriting of Bates; that he had seen him write, but he did not know how many times, and had seen him write his name three or four times before the trial; that he would come into the bank and cash checks and endorse them, and sometimes sign notes, and he had seen him sign a note in 1915, and says in substance that the note with which the signature to the note in question was compared was signed in the regular course of business and was in the bank, and while he did not see

him sign it no question was ever raised as to the genuineness of that note.

David Hays, prominent lawyer of Whitesburg, says that he had known Robert Bates, Sr., all his life; that he had been a director at the First National Bank and that he thought Bates had done business with the bank; that he was also attorney for the bank, and was fairly familiar with the handwriting of Robert Bates, Sr., and that at the time of the signing of the note in question he was well acquainted with the handwriting, and that in his judgment the signature was that of Robert Bates, Sr.

Jim Whittaker states that he was familiar with the handwriting of Robert Bates, Sr., and while he did not know for sure that he had ever seen him write in 1915, that for several years about that time he had a good deal of business with him and had handled a good many of his checks, and that he had seen him write his name to a check and sign his name, but that he could not be positive about when it was, but thought it was in 1915 or 1916. Robert Bates, Jr., on cross-examination stated that he was acquainted with the handwriting of his father, that he himself signed the note in question, and had turned the same over to Hogg & Son, and the signature of Robert Bates, Sr., was on it at the time, and he then thought it was his father's signature, although he was not present when he signed it, and goes on and states about sending Johnson to his father's home with the note for his signature as recited above.

It is admitted by Robert Bates, Sr., that he had signed other notes for his son, Robert Bates, Jr., and the evidence shows that his landed estate was worth at least fifty thousand dollars. He was very old during these transactions, and it is by no means improbable that his memory had failed to a great extent. There was every incentive for him to aid and assist his son and namesake in business, and at that ripe age it is improbable that he would have declined to become the surety of his son in a legitimate business transaction.

The evidence as a whole sustains the verdict, and while no witness saw him sign this note and he himself positively says he did not, the evidence of these reputable persons who were more or less familiar with his handwriting authorized the verdict.

But it is contended for appellant that because some of the witnesses who were introduced failed to state they had seen Robert Bates, Sr., write, or had seen writing admitted by him to be his, their evidence was incompetent. One or more of the witnesses introduced by appellees did fail to state they had ever actually seen Robert Bates, Sr., write, but they showed familiarity with his handwriting in other transactions with him in which there was a presumption of the genuineness of writings purporting to have been signed or written by him.

It is not always essential to qualify one to express an opinion as to the genuineness of a signature that he should have seen the person write, or even that he should have seen writings admitted by him to be in his hand; if, on the contrary, one having business association and business transactions with another, and in such association and transactions becomes familiar with his handwriting or signature to other papers or documents acted upon by him and treated by him as genuine, then the witness may fairly be said to be competent to testify as to his handwriting although never having seen him write.

The cashier of a bank may never have seen one of its customers sign his name, yet through a long course of business dealing he may be perfectly familiar with that man's signature, because he knows of many transactions wherein a certain signature was acted upon and treated by that man as his own.

The rule is accurately stated in the case of Fee v. Taylor, 83 Ky. 259, as follows:

"The general rule is, that a witness who is introduced to prove the handwriting of a person must have personal knowledge of it, either by having seen him write, or by having seen writing admitted by him to be his or, with his knowledge, acted upon as his, or so adopted into the ordinary business of life as to create a reasonable presumption of its genuineness."

Under a fair interpretation of that rule none of the evidence admitted by the trial court was incompetent.

Judgment affirmed.