**Caryn Renee ROACH, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2009–SC–000058–MR.**

Supreme Court of Kentucky.

May 20, 2010.

Emily Holt Rhorer, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Micah Brandon Roberts, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

## I. INTRODUCTION.

A circuit court jury convicted Caryn Renee Roach of adult exploitation, three counts of second-degree criminal possession of a forged instrument, and being a second-degree persistent felony offender (PFO 2). In accordance with the jury's recommendation, the trial court sentenced Roach to twenty years' imprisonment and entered judgment accordingly. Roach now appeals this judgment as a matter of right.[1]

Roach contends that the trial court erred by (1) failing to direct a verdict of acquittal on the adult exploitation charge because the evidence at trial showed that the alleged victim had no mental or physical impairment requiring the alleged victim to need assistance with managing her affairs, (2) allowing introduction of the testimony of the lead detective opining that several checks written on the alleged victim's account likely had not been signed by the alleged victim, and (3) allowing witnesses to testify to statements made by the alleged victim before her death. Roach further urges reversal based upon alleged palpable error arising in the trial proceeding as a result of (1) the lead detective's vouching for other witnesses and bolstering his own investigation, (2) the prosecutor improperly citing law in his closing argument, and (3) the cumulative effect of all alleged errors.

We find no reversible error and affirm the judgment of the trial court.

## II. FACTS.

This case arose when the family of 90-year-old Eba Wilson[2] suspected that several checks written on her account had been forged. Although no one disputed that Eba remained mentally alert until her death, Eba's eyesight had deteriorated to the point that she often had family members or her caretaker, Roach, fill in her checks, which she then signed.

In addition to the loss of eyesight, Eba also suffered from significant hearing loss, knee problems, and diabetes. Despite her physical frailties and advanced age, Eba strove to maintain her independence as much as possible. She exercised control over her finances by having her monthly checking account statements read to her by her son, Wendell Wilson, or Wendell's wife, Jean, and by remaining aware of her checkbook balance and her expenditures. Wendell remembered Eba as being frugal with her money and closely tracking her expenses because she was aware that her financial resources were limited, and she intended to make these limited resources last.

---

1. Ky. Const. § 110(2)(b).

2. Although our normal practice is to refer to people by their surnames rather than their first names in our opinions, we will refer to the several Wilsons involved in this case by their first names to avoid confusion.

Several months before her death, Eba and Wendell both suffered health setbacks that forced a deviation from their routine review of Eba's checking account statements, which customarily happened soon after each statement arrived in the mail. Wendell was hospitalized for about a month and was unable to review Eba's checking account statement for the preceding month with her. Later, he testified at trial to never having seen the statement missed because of his hospitalization.

A month later, Eba passed out at home; and Roach, who had been working for several months as Eba's live-in caretaker, called an ambulance. Eba was then taken to a hospital where she remained for two or three days before being released to a nursing home. Because Eba never returned home after being taken to the hospital, Roach's employment as Eba's caretaker ceased.

After Eba was placed in the nursing home, her checking account statements were redirected to Wendell's home address. Wendell had obtained power of attorney to handle financial matters for Eba and had also been designated as a signatory on her checking account. Wendell became alarmed when he noticed several large checks totaling $6,000 written out to Roach and to Roach's daughter, Chasity Goatee.

After Wendell went to his mother's bank to sign affidavits of forgery on several suspicious checks,[3] the police and the Cabinet for Health and Family Services (CHFS) Adult Protective Unit commenced investigations, including separate interviews with Wendell, Jean, Eba, Roach, and Goatee. Ultimately, the authorities charged Roach with adult exploitation and three counts of second-degree criminal possession of a forged instrument.[4]

Lead detective Robert Duvall and Lisa Loftus of the CHFS Adult Protective Unit both testified at trial about their investigations. Both noted that Roach denied writing the allegedly forged checks and indicated that Roach asserted that Eba had loaned her money through some of these checks.

The jury found Roach guilty of adult exploitation, three counts of second-degree criminal possession of a forged instrument, and PFO 2. It recommended a total sentence of twenty years' imprisonment.[5] The trial court entered judgment in accordance with the jury's recommendations and also ordered Roach to make restitution for the forged checks to the victim's family.

### III. ANALYSIS.

#### A. Trial Court Properly Denied Directed Verdict Motion.

█ Roach contends that the trial court erred in denying her motion for a directed verdict on the adult exploitation charge because of an alleged lack of evidence that

---

3. The disputed checks were all written during the period of Wendell's temporary incapacity.

4. Apparently, Goatee was also criminally charged; but any resolution of the criminal case against her occurred separately from the resolution of the criminal case against Roach.

5. Before finding Roach guilty of PFO 2, the jury recommended underlying sentences of ten years' imprisonment on the adult exploitation conviction, to run concurrently with sentences of five years' imprisonment each on the three second-degree criminal possession of a forged instrument convictions. After convicting her of PFO 2, the jury recommended enhancing her underlying sentences to twenty years' imprisonment on the adult exploitation conviction and ten years' imprisonment on each of the three other convictions, all to run concurrently for a total of twenty years' imprisonment. The trial court entered judgment accordingly.

Eba was unable to manage her own affairs as required to invoke the protection of Kentucky Revised Statutes (KRS) Chapter 209, the Kentucky Adult Protection Act.[6] Roach points to a lack of evidence that Eba suffered any mental dysfunction and argues that Eba's physical infirmities did not rise to the level of physical dysfunction to render her unable to manage her own affairs, pointing out that Eba was aware of her financial situation. We are unaware of any other Kentucky appellate opinions that directly construe the requirements for a conviction of adult exploitation under KRS 209.990(5), so this appears to be a matter of first impression.[7]

The controlling statutes allow for finding adult exploitation if the adult victim suffers from either mental or physical limitations preventing that adult from managing her own affairs.[8] So, despite the undisputed fact that Eba suffered no mental impairment, the evidence at trial was sufficient to show that Eba's physical limitations forced her to seek assistance in managing her affairs. For example, ample testimony proved that Eba's limited vision required her to call on others to fill in checks, which she signed herself. And her customary awareness of her checking account balance stemmed largely from Wendell's or Jean's oral review of the bank statements with Eba. In other words, Eba was able to keep track of her finances but only with assistance. As the Commonwealth contends, the fact that she needed a live-in caretaker to help her with everyday living activities is further evidence that despite her mental

**6.** KRS 209.080 states: "This chapter may be cited as the Kentucky Adult Protection Act." KRS 209.090 declares a legislative intent to establish protective services for adults who "are unable to manage their own affairs or to protect themselves from abuse, neglect, or exploitation." KRS 209.020(4) defines an *adult* subject to the protection offered by this chapter (including provisions criminalizing abuse, neglect, and exploitation of such adults such as KRS 209.990) as "a person eighteen (18) years of age or older who, because of mental or physical dysfunctioning, is unable to manage his or her own resources, carry out the activity of daily living, or protect himself or herself from neglect, exploitation, or a hazardous or abusive situation without assistance from others, and who may be in need of protective services...."

**7.** A recent Westlaw search for Kentucky state court cases citing KRS 209.990 showed that the Court of Appeals noted a litigant's conviction for adult exploitation in a published case, but the analysis of the Court of Appeals concerned issues relating to work release, home incarceration, and contempt and did not construe the elements of adult exploitation under KRS 209.990(5). *See Louisville Metro Dept. of Corrections v. King,* 258 S.W.3d 419 (Ky.App. 2007). Our search also revealed that this Court analyzed the offense of adult neglect under KRS 209.990(2) in *Caretenders, Inc. v.*

*Commonwealth,* 821 S.W.2d 83 (Ky.1991) and the Court of Appeals reviewed the offense of adult abuse in *Morris v. Commonwealth,* 783 S.W.2d 889 (Ky.App.1990). The Court of Appeals also noted a litigant's conviction for adult abuse or neglect; but its analysis concerned only jurisdictional issues in the unpublished case of *Smith v. Commonwealth,* No.2005–CA–001458–MR, 2006 WL 3456668 (Ky.App. Dec.1, 2006).

**8.** KRS 209.990(5) states: "Any person who knowingly exploits an adult, resulting in a total loss to the adult of more than three hundred dollars ($300) in financial or other resources, or both, is guilty of a Class C felony." KRS 209.020(4) defines an *adult* under the protection of KRS Chapter 209 as "a person eighteen (18) years of age or older who, *because of mental or physical dysfunctioning,* is unable to manage his or her own resources, carry out the activity of daily living, or protect himself or herself from neglect, exploitation, or a hazardous or abusive situation without assistance from others, and who may be in need of protective services ...." (emphasis added). *See also* KRS 209.020(9) (defining *exploitation* as "obtaining or using another person's resources, including but not limited to funds, assets, or property, by deception, intimidation, or similar means, with the intent to deprive the person of those resources....").

acuity, Eba required assistance to manage her affairs.[9]

Given our well-known standard for reviewing rulings on motions for directed verdict, articulated in *Commonwealth v. Benham*,[10] we conclude that the trial court did not err in denying Roach's directed verdict motion.

B. *Any Error in Admitting Detective's Testimony Concerning Differences in Signatures on Checks was Harmless.*

 Roach contends that the trial court erroneously admitted opinion testimony from lead detective Robert Duvall concerning whether the signatures on certain checks were likely Eba's. We conclude that to the extent that the trial court erred in admitting Duvall's testimony concerning his examination of signatures on the checks, the error was harmless.

Wendell was permitted to offer his opinion that the signatures on several checks did not appear to be Eba's. Roach does not attack the admissibility of Wendell's opinion testimony on appeal despite having challenged it at trial. As a result, the admissibility of Wendell's opinion testimony is not before us, so we make no specific determination about it. We do note in passing that Kentucky caselaw has previously recognized the propriety of admitting such lay witness testimony when the lay witness is very familiar with the signatory's handwriting, and the testimony would be helpful to the jury.[11]

Perhaps the case at hand presented more than the usual evidentiary challenges in judging the authenticity of signatures because of Eba's impaired vision and the absence of any official exemplar of her

9. Roach argues that perhaps adults who retain their mental faculties but have physical disabilities would not wish to have the special protection provided by KRS Chapter 209. But we need not determine the wisdom of the public policy ramifications of KRS Chapter 209. *Robinson v. Commonwealth*, 212 S.W.3d 100, 106 (Ky.2006), *quoting Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 614 (Ky.1992) ("It is beyond the power of a court to vitiate an act of the legislature on the grounds that public policy promulgated therein is contrary to what the court considers to be in the public interest. It is the prerogative of the legislature to declare that acts constitute a violation of public policy.") (internal quotation marks omitted). Here, by the plain language of the governing statutes, the legislature clearly intended to offer protection not only to adults who required assistance in managing their affairs because of their mental dysfunction, but also to adults who required such assistance as a result of physical dysfunction. We refuse to disturb this clear expression of legislative intent by questioning the wisdom of this public policy.

10. 816 S.W.2d 186, 187 (Ky.1991) ("On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt,

only then the defendant is entitled to a directed verdict of acquittal.").

11. Before the adoption of the Kentucky Rules of Evidence (KRE), our caselaw permitted lay witness opinion testimony concerning the authenticity or identity of handwriting or signatures upon a sufficient showing of familiarity with the handwriting or signature. *See, e.g.,* *Roberts v. McCown*, 288 Ky. 543, 156 S.W.2d 840, 844 (1941), *Bates v. Hogg*, 199 Ky. 465, 251 S.W. 620, 621 (1923). We have produced a paucity of reported cases concerning requirements for the admission of lay witness opinion testimony on handwriting since the adoption of the KRE, although we expressed an inclination toward an inclusionary rather than exclusionary approach to such testimony in *Hampton v. Commonwealth*, 133 S.W.3d 438, 440–41 (Ky.2004) (concluding that bank employee's non-expert opinion that signature on loan documents differed from that on driver's license was properly admitted under KRE 701, despite rejecting Commonwealth's argument that bank employee had become familiar with signature from processing loan because "the documents that the Commonwealth contends established [bank employee's] familiarity, the loan papers, are that which it seeks to prove as a forgery.").

signature, such as a current driver's license. Eba's signature varied on different documents, and she depended upon the handwriting of others to complete all but the signature on her checks. For example, Wendell admitted that a signature on an unchallenged check to a doctor did not really look like his mother's signature and also admitted that his mother's signature changed somewhat from check to check. Jean testified that the handwriting on an unchallenged check written to a hairdresser looked like her own handwriting, although from our review of her testimony, it is unclear whether Jean meant the handwriting on other portions of the check or the actual signature portion. Given Jean's other testimony that she sometimes filled in other portions of the check for Eba, perhaps Jean meant that other portions of the check looked to be in Jean's handwriting without actually meaning to suggest that the signature looked like Jean's handwriting.

We recognize that Detective Duvall's opinion testimony could appear to the jury to be potentially more reliable testimony that might tend to buttress the testimony of Eba's family members, who conceivably might stand to inherit assets and, thus, might benefit financially from Roach's conviction. But having reviewed Detective Duvall's testimony in detail, we find no reversible error in its admission.

As Roach points out, the trial court did not allow admission of Duvall's testimony as expert testimony under KRE 702.[12] Despite having taken some college courses that covered handwriting analysis and having had experience in cases involving fraud and crimes against the elderly, Detective Duvall testified that he was "by no means a handwriting expert." The trial court did not make any finding that he was a handwriting expert. Instead, the trial court admitted Detective Duvall's testimony as lay witness opinion testimony under KRE 701.[13]

Having reviewed his testimony, we note that Detective Duvall never directly opined that the signatures on certain checks were actually forged.[14] More accurately, in the context of explaining how the investigation

12. KRE 702 states:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Although we express no opinion on whether Duvall's testimony could have been properly admitted as expert testimony in this case, we note that an example of a case in which expert testimony concerning handwriting was held properly admitted can be found in our opinion in *Florence v. Commonwealth*, 120 S.W.3d 699, 701–03 (Ky.2003) (upholding forgery conviction where detective testified as handwriting expert).

13. KRE 701 states:
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
> (a) Rationally based on the perception of the witness,
> (b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and
> (c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

14. *Compare Hampton*, 133 S.W.3d at 441 (noting bank employee "did not opine that the signatures on the loan documents were, in fact, forged. Rather, she stated that in her opinion the signatures on the documents and the signature on Wade's driver's license did not look the same.").

proceeded and why the prosecution went forward, Detective Duvall recounted how he recognized significant differences between the signatures on those checks that Wendell purported to know were Eba's as compared to those that Wendell contended were suspicious.

Detective Duvall noted that in the unchallenged signatures, there was no gap in *Eba*, whereas, in the supposedly suspicious checks, the *E* stands by itself with some space before the rest of the name. He also observed the presence of flat *E*'s in unchallenged signatures versus the presence of curls at the top of *E*'s in the signatures on suspicious checks. He also pointed out that the unchallenged signatures contained rounded *M*'s and *W*'s, but the suspicious signatures contained spiked *M*'s and *W*'s.[15] Detective Duvall expressed the opinion that even laypeople should be able to observe such differences and that most people have a fairly consistent pattern in writing, although subtle differences appear among the same person's handwriting samples. Under the relatively recent precedent we established in

*Hampton*, the trial court did not abuse its discretion by admitting this lay witness opinion testimony on handwriting because it was based upon Detective Duvall's own observations and was potentially helpful to the jury.[16]

While Detective Duvall did not directly opine that the checks were forged, we acknowledge that his testimony certainly added credence to Wendell's opinion that they were. Detective Duvall's testimony essentially pointed out differences in the signatures that the jury could observe for itself and judge whether any such differences indicated forgery when it examined the evidentiary exhibit of the challenged and unchallenged checks.

Even assuming for the sake of argument that Detective Duvall's lay witness opinion testimony concerning the signatures was admitted in error,[17] we conclude that any error would have been harmless because we can say with fair assurance that this testimony did not substantially sway the judgment.[18]

---

**15.** Eba signed her name as *"Eba M. Wilson"* on checks.

**16.** *Id.* (Bank employee's "testimony was based on her personal observation and was helpful to determining a fact in issue, *viz:* whether Appellant had a financial motive for murdering her husband. Accordingly, [bank employee's] testimony was properly admissible under KRE 701.").

**17.** Without reaching the issue ourselves, we note that some other courts do not permit lay witness testimony concerning the authenticity of signatures where the witness only became familiar with the subject's handwriting in anticipation of litigation. *See, e.g., Bell v. State,* 910 So.2d 640, 644 (Miss.Ct.App.2005) (holding that authentication of handwriting by lay witness is only permitted under Mississippi rules of evidence if lay witness's familiarity with handwriting is "based upon familiarity not acquired for purposes of the litigation.") (internal quotation marks omitted). We also note KRE 901 offers "[b]y way of illustration

only, and not by way of limitation" an example of a proper means of authentication of a handwritten document by "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for the purposes of litigation." KRE 901(b)(2). We neither adopt nor reject Roach's reading of this example of proper authentication of a document as clearly providing that lay witness testimony on handwriting is necessarily prohibited if the familiarity with the handwriting was acquired for purposes of litigation because we conclude that any error in the instant case was harmless.

**18.** *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009), *citing Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ("A nonconstitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error."). *See also* Kentucky

### C. *Inadvertent Presentation of Hearsay Evidence from Deceased Victim Did Not Result in Reversible Error.*

Roach argues that palpable error and manifest injustice resulted from hearsay statements from Eba being repeated by other witnesses at trial.[19] Having thoroughly examined the record, we note that most, if not all, of the challenged hearsay appears to have been volunteered by witnesses rather than intentionally elicited by the Commonwealth and that the trial court sustained all hearsay objections lodged by Roach. With that perspective, we conclude that the effect of the single isolated hearsay statement admitted without objection did not result in reversible error.

The investigation of this case commenced about six months before Eba died, and Roach's trial took place some four months after Eba died. But, apparently, Eba's version of events was never preserved by deposition or affidavit.

At trial, in response to the Commonwealth's questions asking Wendell why he became suspicious and went to his mother's bank seeking to take action, Wendell testified on direct examination that he asked his mother if she had written checks to Roach and said that he went to her bank to file a complaint because "I asked my mother first if she had written checks to her, to anybody, she said no, she hadn't written any." Roach objected on hearsay grounds, and the trial court sustained her objection. Roach did not request an admonition.

As Wendell's direct examination continued, the Commonwealth read the affidavit of forgery aloud and then asked Wendell about the basis of an allegation regarding one suspicious check. Wendell responded that the signature did not look like his mother's signature and said, "I had talked to my mother about it; she didn't authorize nobody." Roach did not object to this statement.

The Commonwealth then asked Wendell about the affidavit of forgery on another check. Wendell stated that he had not authorized that check and stated, "My mother said she didn't authorize it." Roach objected on hearsay grounds. The trial court sustained the objection, and no admonition was requested.

After Wendell reviewed the other checks, the Commonwealth then asked him about the bases for the affidavits of forgery on those checks "other than what your mother said." Wendell responded that he did not authorize the checks.

---

Rules of Criminal Procedure (RCr) 9.24 ("No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.").

19. In her briefs to this Court, Roach specifically invokes RCr 10.26 and KRE 103(e) in arguing that she is entitled to relief due to a palpable error affecting her substantial rights and resulting in manifest injustice. Because these rules provide guidance on when relief may be granted despite the fact that an issue is insufficiently preserved for review, Roach appears to concede that the she did not adequately preserve these hearsay issues for review. We note that she objected to some but not all of the statements she contends were erroneously admitted and that the trial court sustained all of her objections. With regard to Roach's single requested admonition, the trial admonished the jury to disregard the detective's testimony.

Roach did not object to the question or move to strike the answer.

Following Wendell's testimony and the rest of the Commonwealth's case, Detective Duvall testified as the last witness for the Commonwealth. In his testimony, he indicated that he had interviewed Eba at the nursing home. The prosecutor cautioned him not to tell the jury what Eba said but asked about his perception of her. He responded, characterizing her as a "spunky lady" and further stating: "She knew exactly what was going on.... She knew what happened and she wasn't a happy camper." Roach objected, arguing that Detective Duvall had just gotten the substance of Eba's interview into evidence and requested an admonition. The trial court then admonished the jury to disregard what Detective Duvall said Eba knew or what her feelings were because he could not know what was going on in her mind.

Although the jury clearly heard hearsay statements attributed to Eba,[20] the trial court granted all the relief that Roach requested. Specifically, when Roach objected on hearsay grounds during Wendell's testimony, the trial court sustained the objections; and when Roach requested an admonition during Detective Duvall's testimony, the trial court admonished the jury to disregard the detective's comments, which technically were not direct recountings of any specific statements by Eba.

We have clearly stated in our precedent that where an objection on hearsay grounds is sustained and no admonition is requested, no error occurs.[21] We have also clearly stated in precedent that an admonition is presumed to cure any error.[22]

Roach argues that the presentation of hearsay statements by Eba without opportunity for cross-examination violated her Confrontation Clause rights and resulted in palpable error. But we conclude that any error in the trial court's handling of these statements did not arise to the level of palpable error.

■■■ The Sixth Amendment prohibits the admission of a testimonial statement of a declarant who does not appear at trial, unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross examination.[23] The ad-

**20.** *See* KRE 801(c) (defining *hearsay* as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). No one has suggested that the statements were offered for reasons other than to prove the truth of the matter asserted; thus, presumably these statements by Eba can be fairly characterized as hearsay. Generally, hearsay is not admissible in evidence, KRE 802, except under certain recognized exceptions. *See, e.g.,* KRE 803, KRE 804. No one has argued that any hearsay statements were properly admitted under any recognized exception.

**21.** *Soto v. Commonwealth,* 139 S.W.3d 827, 861–62 (Ky.2004) ("Appellant objected to this testimony as hearsay and the trial judge sustained the objection. Appellant did not request an admonition to the jury to disregard the evidence; thus, no error occurred. (Merely voicing an objection, without a request for a mistrial or at least for an admonition, is not sufficient to establish error once the objection is sustained.). Absent countervailing evidence, the failure to request a limiting admonition is regarded as a trial tactic, intended to avoid calling further attention to the improper evidence.") (citations and internal quotation marks omitted).

**22.** *Parker v. Commonwealth,* 291 S.W.3d 647, 658, (Ky.2009), *quoting Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky.2003) (("jury is presumed to follow an admonition to disregard evidence[,] and an admonition is presumed sufficient to cure errors.") internal quotation marks omitted).

**23.** *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

missibility of non-testimonial hearsay is governed by a state's rules of evidence.[24]

While we refrain from determining whether the statements at issue were testimonial, obviously the admission of any testimonial statements by Eba would be in error because of her unavailability at trial and the lack of prior opportunity for cross-examination. But we note that the trial court sustained all of Roach's hearsay objections. Hearsay statements were excluded when Roach objected, and an admonition given when Roach requested it. We further conclude that in the instances where Roach failed to object or failed to request an admonition, no palpable error resulted.

■■ Some of the statements of which Roach now complains simply were not hearsay. For example, when the prosecutor asked Wendell about his basis for an affidavit of forgery "other than what your mother said," the prosecutor appears to be directing Wendell not to recount hearsay statements. And Wendell's response to this question—that he did not authorize the checks—in no way recounted any statement by his mother. As another example, the detective's descriptions of Eba knowing what was going on and "not being a happy camper" did not directly relate any statements by her. Furthermore, the trial court admonished the jury to disregard the detective's testimony on this matter.

In regard to the three actual hearsay statements recounted in Wendell's testimony: all stating that his mother said she did not write or authorize checks, two of these statements were not admitted because the trial court sustained Roach's objections on hearsay grounds and Roach did not request admonitions. And we conclude that no palpable error resulted from the trial court failure to admonish the jury on its own motion to disregard these statements or from the unobjected-to testimony of Wendell that "I had talked to my mother about it; she didn't authorize anybody." Even without this statement, the jury heard that Wendell and Eba regularly reviewed her checking account statements and that she remained mentally astute during the last few months of her life; thus, they would likely have reasonably surmised that Eba denied writing or authorizing the checks during her lifetime for the prosecution to go forward. Thus, Roach is not entitled to relief on this ground.

### D. No Reversible Error from Alleged Bolstering.

■ Admitting that the issue was not preserved for review by objection at trial, Roach argues that palpable error resulted from Detective Duvall being allowed to bolster the testimony of Lisa Loftus of the CHFS Adult Protective Unit, Wendell, and Goatee and his own investigation by testifying that nothing in their testimony was inconsistent with what he found in his investigation.

■ As the representative of law enforcement for this case, Detective Duvall was permitted to sit at the prosecution table and to observe other witnesses' testimony before he testified as the Commonwealth's final witness. Generally, a witness should not be allowed to vouch for the truthfulness of other witnesses.[25] But any error in the trial court's permitting Detective Duvall to testify in this fashion did not rise to the level of palpable error.

---

24. *Rankins v. Commonwealth*, 237 S.W.3d 128, 130 n. 5 (Ky.2007), (*citing Crawford*, 541 U.S. at 68, 124 S.Ct. 1354).

25. *Stringer v. Commonwealth*, 956 S.W.2d 883, 888 (Ky.1997).

Detective Duvall did not directly assert that the other witnesses were truthful, although his testifying to their testimony being consistent with his investigation does suggest that he found their accounts credible. Nonetheless, this testimony would seem to have little practical effect because without it, the jurors could still compare his account of the results of his investigation with the information provided by other witnesses in their testimony and observe no troubling inconsistencies among their accounts. In short, the admission of this testimony does not rise to the level of palpable error.[26]

### E. Prosecutor's Reading of KRS 209.090 in Closing Argument Not Palpable Error.

 Roach argues palpable error in the prosecutor's reading from KRS 209.090[27] in closing argument, thus permitting the prosecution to cite law outside the trial court's instructions to the jury. Although our predecessor court did state that "[t]he only law which the jury should be interested in is that contained in the court's instructions" and that "[t]he argument of an attorney should be confined to a discussion of the facts of the case and to the instructions as they apply to those facts[,]"[28] we find no palpable error here in light of the fact that the Commonwealth was simply responding to Roach's argument that the statute prohibiting exploitation of adults was only aimed at protecting adults "who don't have their mental facilities about them, folks that can't care for themselves, folks that wouldn't know if you were stealing from them or giving to them."

Because the defense opened the door to arguments about the intent of the legislature, we find no palpable error in the trial court allowing the Commonwealth to respond by reading a statute purportedly stating the legislature's intent on the contested issue. So no reversible error occurred from the reading of this statute in the Commonwealth's closing argument.

### F. No Cumulative Error Meriting Reversal.

Lastly, Roach contends that even if no one error in this case demands reversal in and of itself, the cumulative effect of the errors she alleges demands reversal. We disagree. Roach received a fundamentally fair trial with any errors being so minor that even their cumulative effect does not demand reversal.

### IV. CONCLUSION.

For the foregoing reasons, the judgment of the trial court is affirmed.

---

26. RCr 10.26 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

27. The prosecutor read the following portion of KRS 209.090 (titled as "Legislative intent"): "The General Assembly of the Commonwealth of Kentucky recognizes that some adults of the Commonwealth are unable to manage their own affairs or to protect themselves from abuse, neglect, or exploitation."

The rest of KRS 209.090 (which the prosecutor did not read to the jury) states:
Often such persons cannot find others able or willing to render assistance. The General Assembly intends, through this chapter, to establish a system of protective services designed to fill this need and to assure their availability to all adults. It is also the intent of the General Assembly to authorize only the least possible restriction on the exercise of personal and civil rights consistent with the person's needs for services, and to require that due process be followed in imposing such restrictions.

28. *Broyles v. Commonwealth*, 267 S.W.2d 73, 76 (Ky.1954).

All sitting. ABRAMSON, CUNNINGHAM, SCOTT, and VENTERS, JJ., concur.

NOBLE and SCHRODER, JJ., concur in result only.